In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-05-00204-CR


______________________________




MICHAEL D. MENEFEE, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 188th Judicial District Court


Gregg County, Texas


Trial Court No. 32636-A




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 Someone strangled Jacqueline James to death and left her body, naked and in an unnatural
position, in her own bed. In a Gregg County jury trial, James' recent ex-boyfriend, Michael D.
Menefee, was convicted of murdering James and was sentenced to forty-five years' imprisonment. 
Menefee appeals. His appeal largely centers on the question of whether the evidence supports his
conviction.

 Because we find that (1) the evidence is legally and factually sufficient to support the
conviction, (2) the trial court did not err in admitting evidence of Menefee's fingerprints at the
murder scene, (3) the State did not violate the rules of disclosure stated in Brady v. Maryland, (1) and
(4) admitting the victim's hearsay statements did not affect Menefee's substantial rights, we affirm
the trial court's judgment. 

(1) The Evidence Is Legally and Factually Sufficient to Support the Conviction

 In four points of error, Menefee challenges the sufficiency of the evidence to support his
conviction. (2)

 Our factual sufficiency review looks to all the evidence in a neutral light and determines
whether the evidence supporting the verdict is so weak that the jury's verdict is clearly wrong and
manifestly unjust, or whether the great weight and preponderance of the evidence is contrary to the
verdict. Watson v. State, 204 S.W.3d 404 (Tex. Crim. App. 2006); Johnson v. State, 23 S.W.3d 1, 7
(Tex. Crim. App. 2000); Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We review
the legal sufficiency of the evidence by determining whether a rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt after viewing the evidence in a light
most favorable to the prosecution. Cates v. State, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003)
(citing Jackson, 443 U.S. at 318-19).

 Menefee had a good alibi--that is, until his alibi started unraveling. Menefee maintained 
he was home with his current girlfriend, Anita Owens, when James was killed, not long after
1:00 a.m. January 15, 2004. Though Owens originally confirmed Menefee's alibi to investigators,
she later recanted, relating at least two different stories. Menefee's alibi was also debunked by
Menefee's former neighbor, Craig Hawkes, who testified that on the night of January 14 he had given
Menefee a ride to within six houses of James' home, where she was later found dead. Owens
testified that later that same night, when she thought Menefee was home, he called her from a few
blocks away from James' house for a ride back to his house.

 James' body was found the morning of Friday, January 16, 2004, by family members. Some
degree of decomposition had set in, leading to the conclusion she had been dead for at least twelve
hours and as long as five days. (3) Three witnesses commented on the cleanliness of James' home. (4) 
Perhaps owing to such tidiness, forty-one discrete fingerprints were found in James' home. Several
were identified as James'. Although police compared prints found in the home to those of Ruben
Mananita (James' coworker who had been in James' house within a week before the murder, and with
whom she had lunch plans for Friday, January 16) and Rodney Frasier (an acquaintance of James
about whom little is found in the record other than his name was found in James' purse)--neither
matched. Two fingerprints on the headboard of James' bed were positively identified as Menefee's. 
Menefee admittedly had had a romantic relationship with James, but said he had last been in her
house on Christmas 2003, about three weeks before her death.

 When James' family members discovered her body, she was naked in her bed, with the covers
pulled up to her chin. Longview police officers described the position of James' body as having her
head "pushed up against the headboard in an unnatural position." James' "head was pushed up
against the headboard, kind of cocked off to one side. Her left shoulder was sort of slanted to the
left and pulled back behind her. Her left arm was up under her back. Her left hand was under her
buttocks and actually sticking up between her legs and her right arm was laid over on top of her
pubic area," and "her left leg was picked up to the left side also, bent at the knee." One officer
opined it "appeared that someone had killed her and placed her in bed and covered her up." James'
fingernails had been clipped very short, and twelve or thirteen nail clippings were found in the drain
of her bathtub. Detective Dan Reigstad opined the nails had been cut postmortem; and pathologist
Janice Townsend-Parchman testified that, had the nails been cut while James were still alive, it
would have been "quite painful." 

 In the back of James' house, a bathroom window had been broken out, dirt was found on the
toilet seat, and items in the area had been knocked over. Outside the bathroom window, in the yard,
were imprints from shoes, from which castings were made. In the hallway of James' house, leading
to her bedroom, was found a clump of hair consistent with a patch of missing hair on James' scalp;
also in the hallway was a diamond earring stud matching the stud found in her left ear, apparently
the stud missing from her right ear. 

 Police contacted Menefee the day James' body was found. Menefee agreed to accompany
police to the station and be interviewed. According to Detective Vanover, Menefee said he knew
that James was dead, but never asked officers what had happened to her. Vanover described
Menefee's behavior that morning as extremely nervous, though not upset or distraught at the news
of James' death. "[Menefee] was evasive, real short in his answers. He was visibly shaking," said
Vanover of Menefee's demeanor. Menefee told Vanover that, on the night of Wednesday, January
14, he had been home with his girlfriend Anita Owens, who had left his place at 5:00 a.m. Thursday,
January 15. Menefee acknowledged having dated and having had a sexual relationship with James,
but denied harming her. 

 Initially, Owens corroborated Menefee's story. Between her initial statement to police
following James' killing, though, and Menefee's trial, Owens changed her story at least twice. Her
testimony at Menefee's trial came while she was under indictment for aggravated perjury, (5) and the
trial court admonished her that her testimony could be used against her. 

 At trial, Owens said she was at Menefee's house the evening of January 14; she went to bed
around 9:30 p.m., and Menefee was still up playing video games. Around 2:00 a.m. (January 15),
Menefee telephoned Owens, asking her to pick him up at the intersection of Birdsong and Mobberly
in Longview. From a map of the area introduced into evidence, this intersection appears to be
approximately six to eight blocks from James' house. The State introduced cellular telephone
records showing Menefee called Owens at 1:42, 2:37, and 2:38 a.m. January 15. Owens said that,
when she brought Menefee home, he carried a bag with him. 

 Craig Hawkes, at the time of James' death, lived next door to Menefee. On January 14,
Menefee asked Hawkes if Hawkes, around 10:30 p.m. that night, would give Menefee a ride to
Menefee's mother's house. Menefee had never asked Hawkes for a ride before. Around 10:30 that
night, Menefee came to Hawkes' door, dressed in a dark outfit and carrying some kind of travel bag. 
Menefee told Hawkes that he was going to his mother's house because Menefee had had a fight or
trouble with his girlfriend. Hawkes thought it odd that Menefee would leave his own house rather
than have the girlfriend leave. Hawkes also thought it odd that Menefee did not have Hawkes drop
him at a specific location, which Hawkes offered, but rather at a street corner. Hawkes testified he
thought he dropped Menefee around the corner of 12th and Raney. Raney does not appear on the
maps introduced in evidence. In the course of the investigation, Hawkes took a detective to the
intersection where he had dropped Menefee. Detective David Cheatham testified that intersection
was about six houses north of James' house. Another map shows that 1114 Hutchings, home of
Menefee's mother, is about 1.1 miles from James' home. 

 The jury was presented with evidence that Menefee's fingerprints were found within inches
of James' body, on the headboard of her bed. Menefee uncharacteristically asked his neighbor to take
him to within a block of James' house at 10:30 at night, then later asked that neighbor not to tell
anyone he had given Menefee that ride. Although Menefee claimed he had been with Owens all
night on the night of January 14-15, she testified she had previously lied about being with Menefee,
and in fact that he had called her in the wee hours of the morning to pick him up from the
neighborhood of the murder. 

 Viewing this evidence in a light most favorable to the prosecution, we find a rational trier
of fact could have found the essential elements of the crime beyond a reasonable doubt. The
evidence is legally sufficient to support the jury's verdict. (6)

 Menefee appropriately emphasizes the circumstantial nature of the evidence in this case, and
urges that there are other reasonable potential scenarios in which Menefee was not the killer. When
the evidence suggests the existence of a reasonable alternative hypothesis, the reviewing court must
consider it in our factual sufficiency analysis. Harris v. State, 133 S.W.3d 760, 763-64 (Tex.
App.--Texarkana 2004, pet. ref'd); Richardson v. State, 973 S.W.2d 384, 387 (Tex. App.--Dallas
1998, no pet.). The existence of an alternative reasonable hypothesis may be relevant to a factual
sufficiency review, but the mere existence of such hypothesis is not determinative. See Wilson, 7
S.W.3d at 141. The mere existence of an alternative reasonable hypothesis does not render the
evidence factually insufficient; the standard of review remains the same. Richardson, 973 S.W.2d
at 387. A verdict may be overturned only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust. Escamilla v. State, 143 S.W.3d 814, 817 (Tex. Crim.
App. 2004). We cannot reverse the verdict if reasonable minds could differ about the conclusions
to be drawn from the evidence. Scott v. State, 934 S.W.2d 396, 399 (Tex. App.--Dallas 1996, no
pet.).

 Menefee points out that there was some evidence suggesting the killer took steps to clean up
the scene: there was glass found in a wastebasket, which one detective, along with Menefee's trial
counsel, speculated could have been from the broken bathroom window. Police were not able to
positively identify the fingerprints found on an ammonia bottle behind the kitchen sink, nor on a
dustpan in James' house. There was, however, still broken glass and dirt on the bathroom floor and
dirt on the toilet seat. 

 Menefee makes much of fingerprints on the dustpan and ammonia bottle, saying these point
to another perpetrator. But Detective Reigstad testified the dustpan prints were only "borderline"
useable; he said some of the prints were not useable. Further, this hypothesis presumes the killer
actually used the dustpan and ammonia bottle, for which there is no support (7) in the record. 
Menefee's hypothesis that these unidentified fingerprints belonged to the killer is not supported by
any evidence. 

 Menefee posits the State should have obtained and conducted DNA analysis on Ruben
Mananita, James' coworker, and Rodney Frasier, whose name was found in James' purse. He
criticizes the State's failure to conduct comparisons of castings of the shoe prints found outside the
broken bathroom window. (8) His defensive theory was to raise inferences of other persons who could
have committed the murder, or to raise doubt that Menefee was the killer. But nowhere does he
point to any part of the record which could be said to constitute evidence to support these
hypotheses. Police did compare Mananita's and Frasier's fingerprints to those found in James' house;
none matched.

 Menefee attacks the reasonableness of the time line proffered by the State, wherein James'
whereabouts were accounted for until about 1:00 a.m. Thursday, January 15. Menefee relies on
testimony from James' neighbor, Betty King, that another woman, Arnetta Simon, from King and
James' neighborhood, had told King that Simon had seen James on Thursday, January 15. Menefee
does not, however, assert that he made any attempt to get Simon's testimony at trial. This thirdhand
allegation is hardly so contrary to the overwhelming weight of the rest of the evidence as to suggest
that the verdict is clearly wrong and unjust.

 Menefee also asserts that King said she twice sent her son to put a note on James' door on
January 15 and 16. Other witnesses (9) said that, when they went to the door of James' house the
morning of the 16th, they saw no note. As with the reported statement of Simon, this is at most a
conflict in testimony which, viewed in the context of all the evidence presented, does not render the
verdict clearly wrong and unjust. The jury was free to weigh the evidence and reconcile any
conflicts. See Davis v. State, 147 S.W.3d 554, 557 (Tex. App.--Waco 2004, no pet.) (noting jury 
free to disbelieve alibi testimony); Lebleu v. State, 192 S.W.3d 205, 210 (Tex. App.--Houston [14th
Dist.] 2006, pet. ref'd) (jury to resolve conflicts in testimony and evaluate witness credibility). 

 Two batting gloves were found outside James' house, one stuck on top of a chain-link fence,
one on the ground at the base of the fence. There was testimony that one glove had traces of DNA
from two different people, neither of whom was James or Menefee. Both gloves were examined for
traces of broken glass, without success.

 James' fingernails had been cut back very close, and as many as thirteen nail clippings (10) were
found in the drain of her bathtub. The clippings were tested for the presence of blood or other DNA
samples other than that of James, again without success. (11) Only one of the actual nail clippings was
tested, showing that it did indeed come from James. 

 Although these various points may be seen as loose ends surrounding James' death, we
cannot say that there exists evidence, contrary to the conviction, so strong that the standard of proof,
beyond a reasonable doubt, could not have been met, nor that the jury's verdict is clearly wrong and
manifestly unjust. Escamilla, 143 S.W.3d at 817. The evidence was factually and legally sufficient
to support the jury's verdict.

(2) The Trial Court Did Not Err in Admitting Evidence of Menefee's Fingerprints at the Murder
Scene

 Menefee also complains the trial court erred in admitting evidence of two of Menefee's
fingerprints found on James' headboard. At trial, Menefee objected that he had not been told until
about four days before trial that Menefee's fingerprints were identified as the ones on the headboard. 
He did not object that he did not receive notice the State had fingerprint evidence, only that he was
not told his own prints were among those found. 

 Menefee's trial on the merits began August 16, 2005. Counsel for Menefee lodged an
objection to the State's plan to introduce evidence that two of Menefee's fingerprints had been found
on the headboard of James' bed, where her body was found. On March 10, 2005, the trial court had
signed a discovery order, approved by attorneys for Menefee and the State, which had requested the
defense be allowed to inspect "[a]ll fingerprints, palm prints, foot prints, shoe, tire, or other prints
. . . which are related to the case at bar, and alleged to have some relation to the Defendant . . . or
shall be used by the Stated [sic] in trial on the merits of this case." 

 We review the trial court's decision to admit or exclude evidence under an abuse of discretion
standard. See Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); Montgomery v. State,
810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990) (op. on reh'g). We will not reverse a trial court
whose ruling was within the "zone of reasonable disagreement." Green, 934 S.W.2d at 102;
Montgomery, 810 S.W.2d at 391.

 We begin with the fact that Menefee was not denied discovery of the State's fingerprint
evidence. While the record is not entirely clear, it seems clear enough that Menefee had been
notified that part of the State's evidence included fingerprints. At the hearing where Menefee
presented his objection to the trial court, Menefee characterized his objection as follows: "Well, our
objection now is that it was not adequately provided in time for us to review the matter. It was not
provided in any detail other than the fact that a fingerprint existed on the headboard prior to voir
dire." The State purported to show the trial court a "lift log" of fingerprints from the scene and
where they were located. The trial court stated, "So, [defense attorney]'s objection is that although
this was timely provided, the information as to the match wasn't given to him until Thursday of last
week?" Menefee's attorney answered, "That is correct." 

 Failure to effectuate discovery will not result in reversible error unless it can be shown that
the evidence withheld would have affected the outcome of the trial in the defendant's favor. Butler
v. State, 736 S.W.2d 668, 672 (Tex. Crim. App. 1987) (no error in failing to divulge to defendant
absence of fingerprints on knife) (citing Quinones v. State, 592 S.W.2d 933 (Tex. Crim. App. 1980)). 
A defendant does not have a general right to discovery of evidence in the State's possession.
Quinones, 592 S.W.2d at 940; see Tex. Code Crim. Proc. Ann. art. 39.14 (Vernon Supp. 2006).
A defendant's right to discovery is limited to exculpatory or mitigating evidence. Dickens v. Court
of Appeals, Second Supreme Judicial Dist. of Tex., 727 S.W.2d 542, 551 (Tex. Crim. App. 1987). 
Beyond that, the scope of discovery is within the trial court's discretion. Tex. Code Crim. Proc.
Ann. art. 39.14; Quinones, 592 S.W.2d at 940.

 The State claims Menefee should have asked for a continuance, rather than exclusion of the
proffered fingerprint evidence. There is support for this argument. See Barnes v. State, 876 S.W.2d
316, 328 (Tex. Crim. App. 1994) (defendant claimed error because witness' name not furnished
before trial, despite court order to do so; any error in allowing witness to testify, over defendant's
claim of surprise, rendered harmless by defendant's failure to move for continuance); Murray v. 
State, 24 S.W.3d 881, 893 (Tex. App.--Waco 2000, pet. ref'd) (statement from cell mate wherein
Murray confessed to crime obtained by State 5:30 Friday afternoon and faxed to Murray's attorney
at 6:00 p.m. Friday before Monday trial; to preserve complaint that the late production of the
statement resulted in unfair surprise, Murray required to request trial court continue the trial so he
could review the newly-disclosed evidence); see also Youens v. State, 742 S.W.2d 855, 860 (Tex.
App.--Beaumont 1987, pet. ref'd) (citing Hubbard v. State, 496 S.W.2d 924, 926 (Tex. Crim. App.
1973)).

 The trial court did not err in admitting evidence of Menefee's fingerprints found at the murder
scene.



(3) The State Did Not Violate the Rules of Disclosure Stated in Brady v. Maryland

 Menefee complains the State violated the doctrine of Brady, which mandates that the State
is required to provide potentially exculpatory information to the defense. (12) See also Thomas v. State,
841 S.W.2d 399 (Tex. Crim. App. 1992). The Due Process Clause of the Fourteenth Amendment
to the United States Constitution is violated when a prosecutor fails to disclose evidence which is
favorable to the accused and that creates a probability sufficient to undermine the confidence in the
outcome of the proceeding. Id. at 404. Further, the information must be disclosed to the accused
in time to put it to effective use at trial. See Palmer v. State, 902 S.W.2d 561, 563 (Tex.
App.--Houston [1st Dist.] 1995, no pet.). This includes disclosure of any favorable information in
the possession of police agencies or other parts of the "prosecutorial team." Ex parte Mitchell, 977
S.W.2d 575, 578 (Tex. Crim. App. 1998) (citing Kyles v. Whitley, 514 U.S. 419 (1995)). A
reasonable probability of a different result is shown when the government's evidentiary suppression
undermines confidence in the outcome of the trial. Kyles, 514 U.S. at 435.

 Menefee's complaint is that the State failed to develop evidence that might have been
exculpatory or that might have supported a reasonable hypothesis of the guilt of another. Menefee
complains that castings of shoe prints, found outside the bathroom with the broken window, and
presumptively the point of entry for James' killer, were not compared to shoes belonging to Menefee
or Ruben Mananita, a coworker of James who saw her the night she was killed and who had a lunch
date with her set for Friday, January 16.

 Menefee, however, does not cite any authority saying the State had a duty to do such
investigation or analysis. Menefee's argument is that a possibility exists that, if the shoe print
castings had been compared to Mananita's shoes and if Mananita's DNA had been submitted to the
Department of Public Safety crime laboratory, an alternative, reasonable hypothesis of James' killer
might have been produced. Menefee has not demonstrated or shown any evidence which was known
to the State but not Menefee and that was favorable to Menefee. The purpose of Brady "is not to
displace the adversary system as the primary means by which truth is uncovered, but to ensure that
a miscarriage of justice does not occur." United States v. Bagley, 473 U.S. 667, 675 (1985). "The
mere possibility that an item of undisclosed information might have helped the defense, or might
have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 
Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) (quoting United States v. Agurs, 427
U.S. 97, 109-10 (1976)). Rather, the inquiry is whether the failure of the evidence's disclosure
undermines confidence in the jury's verdict. Lempar v. State, 191 S.W.3d 230, 241 (Tex. App.--San
Antonio 2005, pet. ref'd) (citing Ex parte Richardson, 70 S.W.3d 865, 870 n.22 (Tex. Crim. App.
2002)).

 Here, there has been no showing of any evidence that was withheld. Brady does not impose
a duty on the State to provide facts known to or discoverable by the defendant. See Havard v. State,
800 S.W.2d 195, 204-05 (Tex. Crim. App. 1989). The State has no duty to seek out exculpatory
information independently on the defendant's behalf. Palmer v. State, 902 S.W.2d 561, 563 (Tex.
App.--Houston [1st Dist.] 1995, no writ) ("purpose [of Brady rule] is not to displace the adversary
system") (quoting Bagley, 473 U.S. at 675)). Further, a Brady violation does not arise if the
defendant, using reasonable diligence, could have obtained the information. Westley v. Johnson, 83
F.3d 714, 726 (5th Cir. 1996).

 Menefee cites Brandley as support for his argument that the State's "failure to develop
evidence amounts to [a] violation of due process." See Ex parte Brandley, 781 S.W.2d 886 (Tex.
Crim. App. 1989). Brandley involved the State refusing to obtain and analyze DNA samples of other
individuals seen near the scene of the crime and suppressing the fact that others were seen at or near
the scene around the time of the murder. The Texas Court of Criminal Appeals concurred with the
"trial court's finding that the State's investigation was flawed." Id. at 892. Weighing the cumulative
effects of the State's poor investigation and the totality of the circumstances surrounding Brandley's
conviction, the court found a violation of due process. Id. at 894. Menefee's case is distinguishable;
there has been no finding of inadequate investigation and no evidence the State affirmatively misled
Menefee or suppressed evidence. All of the evidence and theories asserted by Menefee were
available to him to investigate at trial. Menefee has not demonstrated a violation of the Brady
doctrine or a deprivation of due process.

 Menefee also claims error in the trial court's denial of a new trial on this basis. The granting
or denying of a motion for new trial lies within the discretion of the trial court. We do not substitute
our judgment for that of the trial court, but rather decide whether the trial court's decision was
arbitrary or unreasonable. Salazar v. State, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001); Lewis v.
State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). Based on the foregoing discussion concluding the
State did not have a duty to investigate Menefee's defense or argue it, the trial court cannot be said
to have abused its discretion in failing to grant a new trial.

(4) Admitting Victim's Hearsay Statements Did Not Affect Menefee's Substantial Rights

 During the State's case-in-chief, it presented the testimony of James' neighbor, Betty King. 
King testified to about four statements made by James to King, regarding James' relationship with
Menefee:

 (a) James told King that James had been to Menefee's house where she found a woman
(Owens), hiding in the closet. The woman ran from the house when James discovered her. 
James was upset and "real mad" and "angry" when she told King about it, the day it occurred.


 (b) James asked King to take James to Menefee's house to retrieve James' car. At the time,
James was "real upset" and "very angry." 


 (c) On or around New Year's Eve 2003, about two weeks before her death, James told King
she'd broken up with Menefee. King described James as "a little mad" at that time. 


 (d) On January 4, 2004, James came to King's home to use the telephone. James called
Longview police and told them Menefee was sitting on her porch. King said that, while this
happened, James was not crying but was upset and appeared frightened. 


Menefee complains these statements did not properly fall within any hearsay exception. (13) We review
the trial court's decision to admit or exclude evidence under an abuse of discretion standard. Green,
934 S.W.2d at 101-02; Montgomery, 810 S.W.2d at 379-80; see also Wall v. State, 184 S.W.3d 730,
743 (Tex. Crim. App. 2006) (trial court's admission of evidence under excited utterance exception 
reviewed for abuse of discretion).

 We note, at the outset, that only two components of the four referenced bits of testimony
contain hearsay. In item (a), the information that James had seen, hiding in a closet in Menefee's
house, a woman who ran when discovered, and in item (c), the information that James had broken
up with Menefee, are the hearsay elements.

 Hearsay testimony regarding the declarant's emotion or "mental feeling" (14) is admissible so
long as it does not include a statement of memory or belief to prove the fact remembered or believed. 
See Glover v. State, 102 S.W.3d 754, 762-63 (Tex. App.--Texarkana 2002, pet. ref'd) (statements
not admissible under Rule 803(3) because they went beyond statements of declarant's emotional state
to describe past acts). In Salazar v. State, (15) hearsay statements of two counselors were deemed
properly admitted. The statements referred to comments made by child sexual assault victims who
described feeling angry, afraid, frightened, alone, and helpless. The Fourteenth Court of Appeals
held these statements to be admissible under Rule 803(3). Salazar, 127 S.W.3d at 362-63. Also cf.
Martinez v. State, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000) (declarant's statement she was afraid
fit exception in 803(3)). In McDonald v. State, (16) the court found that the wife's statement to her
mother that she had changed the locks at her home to protect herself from her husband was
admissible as a "mental feeling," namely, fear; and thus was properly admitted under Rule 803(3). 
Under Rule 803(3), a witness is allowed to testify that a person was afraid of another person because
such testimony would be considered a mental or emotional condition of the victim. Buhl v. State,
960 S.W.2d 927, 932 (Tex. App.--Waco 1998, pet. ref'd).

 But it is not permissible to admit hearsay evidence regarding facts that reveal why the person
was afraid. Skeen v. State, 96 S.W.3d 567, 576 (Tex. App.--Texarkana 2002, pet. ref'd) (statements
of victim that defendant had been partying, tearing things up, and smoking marihuana, are beyond
the mental or emotional condition exception); Buhl, 960 S.W.2d at 933 (distinguishing between
statements showing mental or emotional condition of fear, and such statements being offered to
prove truth that victim had pulled guns on defendant); see also Pena v. State, 864 S.W.2d 147, 149
(Tex. App.--Waco 1993, no pet.) (testimony victim wanted to leave defendant but felt economically
trapped was offered to show victim's state of mind, not to prove truth of victim's statements);
Williams v. State, 927 S.W.2d 752, 764-65 (Tex. App.--El Paso 1996, pet. ref'd) (victim's
statements to her mother regarding fear husband would hurt mother or daughter revealed only state
of mind).

 While the conduct and statements of James, as related by neighbor King, can be characterized
as statements revealing James' mental or emotional condition, (17)
 there are also hearsay elements that
at least arguably are beyond the mental or emotional condition exception. But, because any error in
their admission would not have affected Menefee's substantial rights, we need not determine whether
the admission of any portion of the challenged testimony was error.

 The import of the hearsay components in the challenged testimony--James finding a woman
in Menefee's closet, the woman running away when discovered, and James and Menefee breaking
up--was essentially that the relationship between James and Menefee was strained or broken. That
import was already in the record, even without the hearsay testimony. Menefee, himself, in a
videotaped interview placed before the jury, admitted that he and James had had recent difficulty in
their relationship and that he had been told, about two weeks before James' death, that James did not
want to see him and that he should let things "cool off." We conclude that admitting the challenged
hearsay testimony, even if error, did not affect Menefee's substantial rights. Therefore, any such
error must be disregarded. See Tex. R. App. P. 44.2(b).





 We affirm the trial court's judgment. 


 Josh R. Morriss, III

 Chief Justice 


Date Submitted: November 30, 2006

Date Decided: December 28, 2006


Publish
1. 373 U.S. 83 (1963).
2. Menefee's first four points of error assert that (1) the evidence was legally insufficient under
state law, (2) the evidence of motive was insufficient to support a conviction, (3) the evidence to
convict was legally insufficient under federal law, and (4) the evidence was factually insufficient
under state law. Regarding point two, it is not necessary that the evidence establish a conclusive
motive for murder. Smith v. State, 965 S.W.2d 509, 519 (Tex. Crim. App. 1998). We construe point
three as a claim that the evidence is insufficient to meet the requirements of Jackson v. Virginia, 443
U.S. 307 (1979). Otherwise, as all these points complain of the sufficiency of the evidence, they will
be addressed together.
3. Notwithstanding that broad range for the possible time of death based on the condition of
the body, James had been alive and at work the evening of January 14. Therefore, she could not have
been dead many days.
4. Neighbor Betty King said she had been in James' house about three times and found James
to be a "very neat" housekeeper and it was "very unusual . . . wasn't like her" to have one of the
carpet runners in the hallway kicked up; Detective Kirk Haddix, describing his first entrance to
James' home, said, "[t]he house is pretty neat. It looks to be fairly clean." Detective Seth Vanover
said, "[t]he house was really clean," and "[t]o be a homicide scene it's awfully clean. It had been
picked up." Vanover said that, while he knew Menefee had been in James' house before, he did not
expect to find Menefee's fingerprints "[b]ased on how clean the house was, the way she kept it." 
5. Owens admitted lying to the grand jury which indicted Menefee. Originally, Owens told
police she had been with Menefee at his house from about 5:00 p.m. January 14 to about 5:00 a.m.
January 15. Later, to the grand jury, she altered her story and said she had gone to Wal-Mart about
1:30 a.m. to buy sleepwear and tampons. The State countered with testimony from a Wal-Mart
employee, with register receipts and records, showing no such sales had occurred at the time Owens
claimed to have made her purchase.
6. As regards Menefee's arguments that there were alternative reasonable hypotheses pointing
to another person being the killer, the Texas Court of Criminal Appeals has rejected the reasonable
hypothesis construct as a measure of legal sufficiency. See Wilson v. State, 7 S.W.3d 136, 141 (Tex.
Crim. App. 1999); Geesa v. State, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991).
7. Or at best, inferential support: although shards of glass were found in a wastebasket, there
was no evidence this glass was from the broken bathroom window, or that the dustpan had been used
to gather the glass. 
8. Menefee's videotaped interview conducted by the police the day James' body was found, and
before Menefee was arrested, shows Menefee agreeing to provide his shoes for comparison with the
footprints outside the bathroom window. It does not appear the police ever did that comparison.
9. James' brother, who discovered her body; Ruben Mananita, who knocked on James' door
the morning of January 16. 
10. At one point, the clippings were referred to as "particles," which might explain why there
seem to have been more clippings than James had fingers.
11. In the noncustodial videotaped interview, Menefee complied with the police request to raise
his shirt on camera, demonstrating he had no visible scratches on his torso.
12. Brady, 373 U.S. at 87.
13. The State initially offered the statements under the authority of Article 38.36 of the Texas
Code of Criminal Procedure. See Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon 2005). Following
argument, objections, and reconsideration, the trial court admitted the testimony as either excited
utterances or statements of then-existing emotional, physical, or mental conditions. Article 38.36,
however, "in no way broadens or otherwise affects the rules of evidence which apply, or the way in
which they apply in any given homicide case." Bush v. State, 958 S.W.2d 503, 505 (Tex. App.--Fort
Worth 1997, no pet.) (quoting Fielder v. State, 756 S.W.2d 309, 318 (Tex. Crim. App. 1988)). The
State therefore had the burden to show that these statements qualified under an exception to the
hearsay rule, to the extent they were hearsay.
14. The trial court's ruling was that, "I think these fall under these exceptions under 803 - - two
and three. If that's the basis of your objection I do agree with you, they have to have an independent
basis for their admissibility other than 38[.]36, but I think the State's established that." The trial
court did not specifically state its decision was based on either excited utterance or then-existing
mental condition; however, the basis of the court's ruling is irrelevant to our determination. If a trial
court's decision to admit certain testimony is correct on any theory or law applicable to the case, we
will uphold its decision. Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990) (en banc).
15. 127 S.W.3d 355 (Tex. App.--Houston [14th Dist.] 2004, pet. ref'd).
16. 911 S.W.2d 798, 806 (Tex. App.--San Antonio 1995, pet. dism'd).
17. Having come from Menefee's house where James found a woman hiding in a closet, King
described James as "real angry" and "upset." King said she could "tell in [James'] voice she was
hurt." King said James related the incident to her the day of its occurrence. King said about a week
later, James came to King's house asking a favor. James asked King to take James to Menefee's
house to retrieve James' car. King described James as "real upset" and "very angry that day." 

 About a month later, on New Year's Eve, shortly before James was killed, King said she
"could tell in [James'] voice that she was a little mad" when she told King that James had broken up
with Menefee. "[James] was the type person she never just let on - - you had to ease in the
conversation to ask her something," King explained. Finally, on January 4, James came to King's
house to use the telephone. James had discovered Menefee sitting on James' porch. King said James
was "upset" and "appeared to be scared because [James] said she came out the side window and ran
around to the back of the house to come" to King's.