In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00085-CV


______________________________




TEXAS DEPARTMENT OF PUBLIC SAFETY, Appellant



V.



RONALD GLENN HARRIS, Appellee




 


On Appeal from the 249th Judicial District Court


Somervell County, Texas


Trial Court No. C09853




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION


 While riding his Harley Davidson motorcycle one night, Ronald Glenn Harris was pulled
over by a state trooper, who told him that his license plate was not properly illuminated. (1) After a
discussion in which Harris admitted he had drunk four beers, but stated he had stopped drinking over
two hours earlier, the officer (Shane Neal) performed a horizontal gaze nystagmus (HGN) test on
Harris' eyes and was evidently not entirely satisfied. Neal then asked Harris to blow in his portable
breath machine. Harris refused. Neal then asked Harris to perform some physical tests, which Harris
did--but which Neal stated he failed. The evidence also shows that Harris had both hips replaced
and that this negatively affected his ability to perform the types of fine motor control required by the
various balance tests.

 Neal again asked Harris to take the breath test, and Harris again declined. Neal then arrested
Harris and transported him to jail, where Harris also refused to take a breath test on the stationary
machine. Harris has not been prosecuted for driving while intoxicated--instead, the State pursued
an administrative action seeking to suspend his license. The administrative law judge (ALJ) found
that Neal stopped Harris because of the defective license plate light, that Neal believed Harris to be
intoxicated because of his tests, and that Harris refused to give a breath sample. The judge also
found that Harris had "one or more" prior alcohol-related or drug-related enforcement contacts
during the prior ten years. The record shows that Harris had received probation for driving while
intoxicated in 1985, and again twelve years later, in 1997, and that he was arrested on this charge
September 16, 2006. Based on the judge's conclusions, she then sustained the suspension of Harris'
license for two years. 

 Harris appealed to the district court of Somervell County, which found in his favor, reversing
the ALJ's decision. The Texas Department of Public Safety (DPS) now appeals, alleging the
evidence was sufficient to support the finding of the ALJ that Neal had reasonable suspicion to stop
and detain Harris and further that Neal had probable cause to believe that Harris was driving while
intoxicated. (2) We reverse the trial court and reinstate the ALJ's order. 

Standard of Review

 At the license suspension hearing, the DPS was required to prove by a preponderance of the
evidence that: (1) reasonable suspicion or probable cause existed to stop or arrest Harris;
(2) probable cause existed to believe that Harris was operating a motor vehicle in a public place
while intoxicated; (3) Harris was placed under arrest by the officer and was requested to submit to
the taking of a specimen; and (4) Harris refused to submit to the taking of a specimen on request of
the officer. See Tex. Transp. Code Ann. §§ 724.042-.043 (Vernon Supp. 2007); Tex. Dep't of Pub.
Safety v. Vasquez, 225 S.W.3d 47, 53 (Tex. App.--El Paso 2005, no pet.); Tex. Dep't of Pub. Safety
v. Norrell, 968 S.W.2d 16, 18 (Tex. App.--Corpus Christi 1998, no pet.). Issues (3) and (4) are not
disputed. 

 Courts review administrative license suspensions under a substantial evidence standard. See
Tex. Transp. Code Ann. § 524.043 (Vernon 2007); Tex. Gov't Code Ann. § 2001.174 (Vernon
2000); see also Mireles v. Tex. Dep't of Pub. Safety, 9 S.W.3d 128, 131 (Tex. 1999). 

 Initially, we recognize that the meaning applied to the term "substantial" evidence has little
to do with the dictionary meaning of the word. (3) Substantial, in this context, does not mean ample,
or considerable in quantity. (4) In contested cases, the reviewing court must affirm the administrative
findings if there is more than a scintilla of evidence to support them. Mireles, 9 S.W.3d at 131. 
Substantial evidence requires only more than a mere scintilla of evidence. R.R. Comm'n of Tex. v.
Torch Operating Co., 912 S.W.2d 790, 792-93 (Tex. 1995). Thus, as has been acknowledged, the
burden for overturning an agency ruling is formidable. Tex. Dep't of Pub. Safety v. Pucek,
22 S.W.3d 63, 67 (Tex. App.--Corpus Christi 2000, no pet.). In fact, it is so formidable that an
administrative decision may be sustained even if the evidence preponderates against it. Mireles,
9 S.W.3d at 131. We are not allowed to determine whether the ruling is correct, but only whether
there is some evidence that might support it. Id.; see also Tex. Gov't Code Ann. § 2001.174. 

 A court's review of an ALJ's decision is appellate in nature. Thus, the district court was not
retrying the case, but instead reviewing the decisions made by the ALJ. Likewise, in our review, we
are independently determining whether the ALJ's decision was supported by the evidence before it. 
An additional issue in this case is the refusal of the ALJ to admit some evidence--which the district
court found to be an erroneous ruling. The district court did not reverse and remand based on the
evidentiary errors, however, but reversed and rendered based on the inadequacy of the evidence
before the ALJ.

 The appellate court reviews de novo the trial court's determination. Tex. Dep't of Pub. Safety
v. Cuellar, 58 S.W.3d 781, 783 (Tex. App.--San Antonio 2001, no pet.); Raesner v. Tex. Dep't of
Pub. Safety, 982 S.W.2d 131, 132 (Tex. App.--Houston [1st Dist.] 1998, no pet.). (5)


The Evidence 

 Neal testified he could not see the license plate at night, that it was not clearly visible, and
that no light was illuminating the license plate. There was a videotape of the stop. The tape is of
poor quality, but the license plate appears to have had some illumination at the time of the stop. It
appeared brighter when the following officer's lights reflected from the plate, but the poor quality
of the tape makes it impossible to conclude as Harris urges that Neal's testimony was "wrong and
impossible." When the facts are in dispute and the findings are based primarily on an evaluation of
credibility and demeanor, "almost total deference" is given to the finder of facts. Guzman v. State,
955 S.W.2d 85 (Tex. Crim. App. 1997). 

 Neal then testified as set out above about the procedures he followed after the stop and the
ultimate arrest made after he concluded Harris was intoxicated.

 Harris testified about the lighting design on his motorcycle--the same bulb illuminates the
taillight, the brake light, and the license plate. Counsel also attempted to introduce evidence about
the motorcycle's condition shortly after the arrest, when Harris had it inspected, as he testified, the
day after he got out of jail. The court refused to admit the evidence, and Harris made an offer of
proof to that effect. 

 Harris also attempted to introduce testimony by telephone (with the agreement of the State)
at the administrative hearing. The testimony would have also been about the nature of the lighting
on this type of motorcycle, provided by a local justice of the peace. The ALJ refused to allow the
method of testimony, with the comment that it required prior notice before such testimony was
accepted due to the unreliability of its telephone lines. 

 The district judge found this improper and admitted an affidavit from that proposed witness
concerning the lighting arrangement on the motorcycle. (6)

 Evidence presented at the administrative hearing also included Neal's officer's report stating
that Harris had slurred speech, bloodshot eyes, an odor of an alcoholic beverage on his person, and
admitted he had drunk four beers. Additionally, the HGN test showed clues of intoxication and
some of the field tests showed that Harris was unsteady. 

Analysis 

 Reasonable suspicion exists if the officer has specific, articulable facts that, when combined
with rational inferences from those facts, would lead the officer to reasonably conclude that a
particular person actually is, has been, or soon will be engaged in criminal activity. Garcia v. State,
43 S.W.3d 527, 530 (Tex. Crim. App. 2001). A reasonable-suspicion determination is made by
considering the totality of the circumstances, giving almost total deference to the fact-finder's
determination of historical facts and reviewing de novo the application of the law to facts not turning
on credibility and demeanor. Castro v. State, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007) (citing
Guzman, 955 S.W.2d at 89). 

 The ALJ was presented with a poor-quality visual recording that appears to indicate that
some light at the rear of the motorcycle was (to some degree at least) working at the time Harris
pulled off the road. She was also presented with evidence from the arresting officer that the license
plate light was not working when he pulled Harris over and that the license plate was not clearly
legible from fifty feet. Harris has shown that conflicting evidence was before the ALJ. However,
the only issue before the district court was whether substantial evidence supported the ALJ's
findings. A reviewing court cannot disregard an ALJ's factual determinations where there is
conflicting evidence. See Mireles, 9 S.W.3d at 131. We conclude that substantial evidence (at least
more than a scintilla) supported the ALJ's reasonable suspicion determination. See Tex. Dep't of
Pub. Safety v. Fisher, 56 S.W.3d 159, 163 (Tex. App.--Dallas 2001, no pet.). 

 Further, we find there is sufficient evidence to uphold the decision of the ALJ that Neal had
probable cause to believe that Harris was operating a motor vehicle in a public place while
intoxicated. 

 As previously noted, courts must affirm administrative findings in contested cases if there
is more than a scintilla of evidence to support them. In fact, an administrative decision may be
sustained even if the evidence preponderates against it. Hesskew v. Tex. Dep't of Pub. Safety, 144
S.W.3d 189, 191 (Tex. App.--Tyler 2004, no pet.). Based on the standard of review required, we
find that the district court erred by reversing the determination of the ALJ.

 We reverse the judgment of the district court and reinstate the judgment of the ALJ.



 Jack Carter

 Justice


Date Submitted: October 18, 2007

Date Decided: December 18, 2007






1. Tex. Transp. Code Ann. § 547.322 (Vernon 1999) states, in part, as follows:


 (f) A taillamp or a separate lamp shall be constructed and mounted to emit
a white light that: 

 (1) illuminates the rear license plate; and 

 (2) makes the plate clearly legible at a distance of 50 feet from the
rear. 

 (g) A taillamp, including a separate lamp used to illuminate a rear license
plate, must emit a light when a headlamp or auxiliary driving lamp is lighted. 


Tex. Transp. Code Ann. § 547.801 (Vernon Supp. 2007) provides:


 § 547.801. Lighting Equipment


 (a) A motorcycle, including a motor-driven cycle, shall be equipped with: 

 (1) not more than two headlamps mounted at a height from 24 to 54
inches; 

 (2) at least one taillamp mounted at a height from 20 to 72 inches; 

 (3) a taillamp or separate lamp to illuminate the rear license plate that
complies with the requirements of Sections 547.322(f) and (g);

 . . . .
2. This appeal was filed with the 10th Court of Appeals in Waco and was transferred to this
Court by order of the Texas Supreme Court as part of its docket equalization process.
3. See Hammack v. Pub. Util. Comm'n of Tex., 131 S.W.3d 713, 725 (Tex. App.--Austin 2004,
pet. denied); Peaster Indep. Sch. Dist. v. Glodfelty, 63 S.W.3d 1, 5 (Tex. App.--Fort Worth 2001,
no pet.); Lauderdale v. Tex. Dep't of Agric., 923 S.W.2d 834, 836 (Tex. App.--Austin 1996, no
writ)
.
4. See Merriam-Webster's Collegiate Dictionary 1245 (11th ed. 2006).
5. Under this standard of review for administrative decisions in contested cases, the court shall
reverse or remand the case for further proceedings if the appellant's substantial rights have been
prejudiced because the administrative findings, inferences, conclusions, or decision are: (A) in
violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority;
(C) made through unlawful procedure; (D) affected by other error of law; (E) not reasonably
supported by substantial evidence considering the reliable and probative evidence in the record as
a whole, or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted
exercise of discretion. Tex. Gov't Code Ann. § 2001.174(2); see also Tex. Dep't of Pub. Safety v.
Cantu, 944 S.W.2d 493, 495 (Tex. App.--Houston [14th Dist.] 1997, no writ) ("[T]o reverse an
agency decision, the reviewing court must conclude (1) that the agency's decision was erroneous for
one of the reasons enumerated in subsections (A) through (F), and (2) that substantial rights of the
appellant have thereby been prejudiced.").
6. At the hearing before the district court, it also became clear Harris had not been charged with
driving while intoxicated as a result of this stop.


Menefee also complains the trial court erred in admitting evidence of two of Menefee's
fingerprints found on James' headboard. At trial, Menefee objected that he had not been told until
about four days before trial that Menefee's fingerprints were identified as the ones on the headboard. 
He did not object that he did not receive notice the State had fingerprint evidence, only that he was
not told his own prints were among those found. 

 Menefee's trial on the merits began August 16, 2005. Counsel for Menefee lodged an
objection to the State's plan to introduce evidence that two of Menefee's fingerprints had been found
on the headboard of James' bed, where her body was found. On March 10, 2005, the trial court had
signed a discovery order, approved by attorneys for Menefee and the State, which had requested the
defense be allowed to inspect "[a]ll fingerprints, palm prints, foot prints, shoe, tire, or other prints
. . . which are related to the case at bar, and alleged to have some relation to the Defendant . . . or
shall be used by the Stated [sic] in trial on the merits of this case." 

 We review the trial court's decision to admit or exclude evidence under an abuse of discretion
standard. See Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); Montgomery v. State,
810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990) (op. on reh'g). We will not reverse a trial court
whose ruling was within the "zone of reasonable disagreement." Green, 934 S.W.2d at 102;
Montgomery, 810 S.W.2d at 391.

 We begin with the fact that Menefee was not denied discovery of the State's fingerprint
evidence. While the record is not entirely clear, it seems clear enough that Menefee had been
notified that part of the State's evidence included fingerprints. At the hearing where Menefee
presented his objection to the trial court, Menefee characterized his objection as follows: "Well, our
objection now is that it was not adequately provided in time for us to review the matter. It was not
provided in any detail other than the fact that a fingerprint existed on the headboard prior to voir
dire." The State purported to show the trial court a "lift log" of fingerprints from the scene and
where they were located. The trial court stated, "So, [defense attorney]'s objection is that although
this was timely provided, the information as to the match wasn't given to him until Thursday of last
week?" Menefee's attorney answered, "That is correct." 

 Failure to effectuate discovery will not result in reversible error unless it can be shown that
the evidence withheld would have affected the outcome of the trial in the defendant's favor. Butler
v. State, 736 S.W.2d 668, 672 (Tex. Crim. App. 1987) (no error in failing to divulge to defendant
absence of fingerprints on knife) (citing Quinones v. State, 592 S.W.2d 933 (Tex. Crim. App. 1980)). 
A defendant does not have a general right to discovery of evidence in the State's possession.
Quinones, 592 S.W.2d at 940; see Tex. Code Crim. Proc. Ann. art. 39.14 (Vernon Supp. 2006).
A defendant's right to discovery is limited to exculpatory or mitigating evidence. Dickens v. Court
of Appeals, Second Supreme Judicial Dist. of Tex., 727 S.W.2d 542, 551 (Tex. Crim. App. 1987). 
Beyond that, the scope of discovery is within the trial court's discretion. Tex. Code Crim. Proc.
Ann. art. 39.14; Quinones, 592 S.W.2d at 940.

 The State claims Menefee should have asked for a continuance, rather than exclusion of the
proffered fingerprint evidence. There is support for this argument. See Barnes v. State, 876 S.W.2d
316, 328 (Tex. Crim. App. 1994) (defendant claimed error because witness' name not furnished
before trial, despite court order to do so; any error in allowing witness to testify, over defendant's
claim of surprise, rendered harmless by defendant's failure to move for continuance); Murray v. 
State, 24 S.W.3d 881, 893 (Tex. App.--Waco 2000, pet. ref'd) (statement from cell mate wherein
Murray confessed to crime obtained by State 5:30 Friday afternoon and faxed to Murray's attorney
at 6:00 p.m. Friday before Monday trial; to preserve complaint that the late production of the
statement resulted in unfair surprise, Murray required to request trial court continue the trial so he
could review the newly-disclosed evidence); see also Youens v. State, 742 S.W.2d 855, 860 (Tex.
App.--Beaumont 1987, pet. ref'd) (citing Hubbard v. State, 496 S.W.2d 924, 926 (Tex. Crim. App.
1973)).

 The trial court did not err in admitting evidence of Menefee's fingerprints found at the murder
scene.



(3) The State Did Not Violate the Rules of Disclosure Stated in Brady v. Maryland

 Menefee complains the State violated the doctrine of Brady, which mandates that the State
is required to provide potentially exculpatory information to the defense. (12) See also Thomas v. State,
841 S.W.2d 399 (Tex. Crim. App. 1992). The Due Process Clause of the Fourteenth Amendment
to the United States Constitution is violated when a prosecutor fails to disclose evidence which is
favorable to the accused and that creates a probability sufficient to undermine the confidence in the
outcome of the proceeding. Id. at 404. Further, the information must be disclosed to the accused
in time to put it to effective use at trial. See Palmer v. State, 902 S.W.2d 561, 563 (Tex.
App.--Houston [1st Dist.] 1995, no pet.). This includes disclosure of any favorable information in
the possession of police agencies or other parts of the "prosecutorial team." Ex parte Mitchell, 977
S.W.2d 575, 578 (Tex. Crim. App. 1998) (citing Kyles v. Whitley, 514 U.S. 419 (1995)). A
reasonable probability of a different result is shown when the government's evidentiary suppression
undermines confidence in the outcome of the trial. Kyles, 514 U.S. at 435.

 Menefee's complaint is that the State failed to develop evidence that might have been
exculpatory or that might have supported a reasonable hypothesis of the guilt of another. Menefee
complains that castings of shoe prints, found outside the bathroom with the broken window, and
presumptively the point of entry for James' killer, were not compared to shoes belonging to Menefee
or Ruben Mananita, a coworker of James who saw her the night she was killed and who had a lunch
date with her set for Friday, January 16.

 Menefee, however, does not cite any authority saying the State had a duty to do such
investigation or analysis. Menefee's argument is that a possibility exists that, if the shoe print
castings had been compared to Mananita's shoes and if Mananita's DNA had been submitted to the
Department of Public Safety crime laboratory, an alternative, reasonable hypothesis of James' killer
might have been produced. Menefee has not demonstrated or shown any evidence which was known
to the State but not Menefee and that was favorable to Menefee. The purpose of Brady "is not to
displace the adversary system as the primary means by which truth is uncovered, but to ensure that
a miscarriage of justice does not occur." United States v. Bagley, 473 U.S. 667, 675 (1985). "The
mere possibility that an item of undisclosed information might have helped the defense, or might
have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 
Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) (quoting United States v. Agurs, 427
U.S. 97, 109-10 (1976)). Rather, the inquiry is whether the failure of the evidence's disclosure
undermines confidence in the jury's verdict. Lempar v. State, 191 S.W.3d 230, 241 (Tex. App.--San
Antonio 2005, pet. ref'd) (citing Ex parte Richardson, 70 S.W.3d 865, 870 n.22 (Tex. Crim. App.
2002)).

 Here, there has been no showing of any evidence that was withheld. Brady does not impose
a duty on the State to provide facts known to or discoverable by the defendant. See Havard v. State,
800 S.W.2d 195, 204-05 (Tex. Crim. App. 1989). The State has no duty to seek out exculpatory
information independently on the defendant's behalf. Palmer v. State, 902 S.W.2d 561, 563 (Tex.
App.--Houston [1st Dist.] 1995, no writ) ("purpose [of Brady rule] is not to displace the adversary
system") (quoting Bagley, 473 U.S. at 675)). Further, a Brady violation does not arise if the
defendant, using reasonable diligence, could have obtained the information. Westley v. Johnson, 83
F.3d 714, 726 (5th Cir. 1996).

 Menefee cites Brandley as support for his argument that the State's "failure to develop
evidence amounts to [a] violation of due process." See Ex parte Brandley, 781 S.W.2d 886 (Tex.
Crim. App. 1989). Brandley involved the State refusing to obtain and analyze DNA samples of other
individuals seen near the scene of the crime and suppressing the fact that others were seen at or near
the scene around the time of the murder. The Texas Court of Criminal Appeals concurred with the
"trial court's finding that the State's investigation was flawed." Id. at 892. Weighing the cumulative
effects of the State's poor investigation and the totality of the circumstances surrounding Brandley's
conviction, the court found a violation of due process. Id. at 894. Menefee's case is distinguishable;
there has been no finding of inadequate investigation and no evidence the State affirmatively misled
Menefee or suppressed evidence. All of the evidence and theories asserted by Menefee were
available to him to investigate at trial. Menefee has not demonstrated a violation of the Brady
doctrine or a deprivation of due process.

 Menefee also claims error in the trial court's denial of a new trial on this basis. The granting
or denying of a motion for new trial lies within the discretion of the trial court. We do not substitute
our judgment for that of the trial court, but rather decide whether the trial court's decision was
arbitrary or unreasonable. Salazar v. State, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001); Lewis v.
State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). Based on the foregoing discussion concluding the
State did not have a duty to investigate Menefee's defense or argue it, the trial court cannot be said
to have abused its discretion in failing to grant a new trial.

(4) Admitting Victim's Hearsay Statements Did Not Affect Menefee's Substantial Rights

 During the State's case-in-chief, it presented the testimony of James' neighbor, Betty King. 
King testified to about four statements made by James to King, regarding James' relationship with
Menefee:

 (a) James told King that James had been to Menefee's house where she found a woman
(Owens), hiding in the closet. The woman ran from the house when James discovered her. 
James was upset and "real mad" and "angry" when she told King about it, the day it occurred.


 (b) James asked King to take James to Menefee's house to retrieve James' car. At the time,
James was "real upset" and "very angry." 


 (c) On or around New Year's Eve 2003, about two weeks before her death, James told King
she'd broken up with Menefee. King described James as "a little mad" at that time. 


 (d) On January 4, 2004, James came to King's home to use the telephone. James called
Longview police and told them Menefee was sitting on her porch. King said that, while this
happened, James was not crying but was upset and appeared frightened. 


Menefee complains these statements did not properly fall within any hearsay exception. (13) We review
the trial court's decision to admit or exclude evidence under an abuse of discretion standard. Green,
934 S.W.2d at 101-02; Montgomery, 810 S.W.2d at 379-80; see also Wall v. State, 184 S.W.3d 730,
743 (Tex. Crim. App. 2006) (trial court's admission of evidence under excited utterance exception 
reviewed for abuse of discretion).

 We note, at the outset, that only two components of the four referenced bits of testimony
contain hearsay. In item (a), the information that James had seen, hiding in a closet in Menefee's
house, a woman who ran when discovered, and in item (c), the information that James had broken
up with Menefee, are the hearsay elements.

 Hearsay testimony regarding the declarant's emotion or "mental feeling" (14) is admissible so
long as it does not include a statement of memory or belief to prove the fact remembered or believed. 
See Glover v. State, 102 S.W.3d 754, 762-63 (Tex. App.--Texarkana 2002, pet. ref'd) (statements
not admissible under Rule 803(3) because they went beyond statements of declarant's emotional state
to describe past acts). In Salazar v. State, (15) hearsay statements of two counselors were deemed
properly admitted. The statements referred to comments made by child sexual assault victims who
described feeling angry, afraid, frightened, alone, and helpless. The Fourteenth Court of Appeals
held these statements to be admissible under Rule 803(3). Salazar, 127 S.W.3d at 362-63. Also cf.
Martinez v. State, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000) (declarant's statement she was afraid
fit exception in 803(3)). In McDonald v. State, (16) the court found that the wife's statement to her
mother that she had changed the locks at her home to protect herself from her husband was
admissible as a "mental feeling," namely, fear; and thus was properly admitted under Rule 803(3). 
Under Rule 803(3), a witness is allowed to testify that a person was afraid of another person because
such testimony would be considered a mental or emotional condition of the victim. Buhl v. State,
960 S.W.2d 927, 932 (Tex. App.--Waco 1998, pet. ref'd).

 But it is not permissible to admit hearsay evidence regarding facts that reveal why the person
was afraid. Skeen v. State, 96 S.W.3d 567, 576 (Tex. App.--Texarkana 2002, pet. ref'd) (statements
of victim that defendant had been partying, tearing things up, and smoking marihuana, are beyond
the mental or emotional condition exception); Buhl, 960 S.W.2d at 933 (distinguishing between
statements showing mental or emotional condition of fear, and such statements being offered to
prove truth that victim had pulled guns on defendant); see also Pena v. State, 864 S.W.2d 147, 149
(Tex. App.--Waco 1993, no pet.) (testimony victim wanted to leave defendant but felt economically
trapped was offered to show victim's state of mind, not to prove truth of victim's statements);
Williams v. State, 927 S.W.2d 752, 764-65 (Tex. App.--El Paso 1996, pet. ref'd) (victim's
statements to her mother regarding fear husband would hurt mother or daughter revealed only state
of mind).

 While the conduct and statements of James, as related by neighbor King, can be characterized
as statements revealing James' mental or emotional condition, (17)
 there are also hearsay elements that
at least arguably are beyond the mental or emotional condition exception. But, because any error in
their admission would not have affected Menefee's substantial rights, we need not determine whether
the admission of any portion of the challenged testimony was error.

 The import of the hearsay components in the challenged testimony--James finding a woman
in Menefee's closet, the woman running away when discovered, and James and Menefee breaking
up--was essentially that the relationship between James and Menefee was strained or broken. That
import was already in the record, even without the hearsay testimony. Menefee, himself, in a
videotaped interview placed before the jury, admitted that he and James had had recent difficulty in
their relationship and that he had been told, about two weeks before James' death, that James did not
want to see him and that he should let things "cool off." We conclude that admitting the challenged
hearsay testimony, even if error, did not affect Menefee's substantial rights. Therefore, any such
error must be disregarded. See Tex. R. App. P. 44.2(b).





 We affirm the trial court's judgment. 


 Josh R. Morriss, III

 Chief Justice 


Date Submitted: November 30, 2006

Date Decided: December 28, 2006


Publish
1. 373 U.S. 83 (1963).
2. Menefee's first four points of error assert that (1) the evidence was legally insufficient under
state law, (2) the evidence of motive was insufficient to support a conviction, (3) the evidence to
convict was legally insufficient under federal law, and (4) the evidence was factually insufficient
under state law. Regarding point two, it is not necessary that the evidence establish a conclusive
motive for murder. Smith v. State, 965 S.W.2d 509, 519 (Tex. Crim. App. 1998). We construe point
three as a claim that the evidence is insufficient to meet the requirements of Jackson v. Virginia, 443
U.S. 307 (1979). Otherwise, as all these points complain of the sufficiency of the evidence, they will
be addressed together.
3. Notwithstanding that broad range for the possible time of death based on the condition of
the body, James had been alive and at work the evening of January 14. Therefore, she could not have
been dead many days.
4. Neighbor Betty King said she had been in James' house about three times and found James
to be a "very neat" housekeeper and it was "very unusual . . . wasn't like her" to have one of the
carpet runners in the hallway kicked up; Detective Kirk Haddix, describing his first entrance to
James' home, said, "[t]he house is pretty neat. It looks to be fairly clean." Detective Seth Vanover
said, "[t]he house was really clean," and "[t]o be a homicide scene it's awfully clean. It had been
picked up." Vanover said that, while he knew Menefee had been in James' house before, he did not
expect to find Menefee's fingerprints "[b]ased on how clean the house was, the way she kept it." 
5. Owens admitted lying to the grand jury which indicted Menefee. Originally, Owens told
police she had been with Menefee at his house from about 5:00 p.m. January 14 to about 5:00 a.m.
January 15. Later, to the grand jury, she altered her story and said she had gone to Wal-Mart about
1:30 a.m. to buy sleepwear and tampons. The State countered with testimony from a Wal-Mart
employee, with register receipts and records, showing no such sales had occurred at the time Owens
claimed to have made her purchase.
6. As regards Menefee's arguments that there were alternative reasonable hypotheses pointing
to another person being the killer, the Texas Court of Criminal Appeals has rejected the reasonable
hypothesis construct as a measure of legal sufficiency. See Wilson v. State, 7 S.W.3d 136, 141 (Tex.
Crim. App. 1999); Geesa v. State, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991).
7. Or at best, inferential support: although shards of glass were found in a wastebasket, there
was no evidence this glass was from the broken bathroom window, or that the dustpan had been used
to gather the glass. 
8. Menefee's videotaped interview conducted by the police the day James' body was found, and
before Menefee was arrested, shows Menefee agreeing to provide his shoes for comparison with the
footprints outside the bathroom window. It does not appear the police ever did that comparison.
9. James' brother, who discovered her body; Ruben Mananita, who knocked on James' door
the morning of January 16. 
10. At one point, the clippings were referred to as "particles," which might explain why there
seem to have been more clippings than James had fingers.
11. In the noncustodial videotaped interview, Menefee complied with the police request to raise
his shirt on camera, demonstrating he had no visible scratches on his torso.
12. Brady, 373 U.S. at 87.
13. The State initially offered the statements under the authority of Article 38.36 of the Texas
Code of Criminal Procedure. See Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon 2005). Following
argument, objections, and reconsideration, the trial court admitted the testimony as either excited
utterances or statements of then-existing emotional, physical, or mental conditions. Article 38.36,
however, "in no way broadens or otherwise affects the rules of evidence which apply, or the way in
which they apply in any given homicide case." Bush v. State, 958 S.W.2d 503, 505 (Tex. App.--Fort
Worth 1997, no pet.) (quoting Fielder v. State, 756 S.W.2d 309, 318 (Tex. Crim. App. 1988)). The
State therefore had the burden to show that these statements qualified under an exception to the
hearsay rule, to the extent they were hearsay.
14. The trial court's ruling was that, "I think these fall under these exceptions under 803 - - two
and three. If that's the basis of your objection I do agree with you, they have to have an independent
basis for their admissibility other than 38[.]36, but I think the State's established that." The trial
court did not specifically state its decision was based on either excited utterance or then-existing
mental condition; however, the basis of the court's ruling is irrelevant to our determination. If a trial
court's decision to admit certain testimony is correct on any theory or law applicable to the case, we
will uphold its decision. Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990) (en banc).
15. 127 S.W.3d 355 (Tex. App.--Houston [14th Dist.] 2004, pet. ref'd).
16. 911 S.W.2d 798, 806 (Tex. App.--San Antonio 1995, pet. dism'd).
17. Having come from Menefee's house where James found a woman hiding in a closet, King
described James as "real angry" and "upset." King said she could "tell in [James'] voice she was
hurt." King said James related the incident to her the day of its occurrence. King said about a week
later, James came to King's house asking a favor. James asked King to take James to Menefee's
house to retrieve James' car. King described James as "real upset" and "very angry that day." 

 About a month later, on New Year's Eve, shortly before James was killed, King said she
"could tell in [James'] voice that she was a little mad" when she told King that James had broken up
with Menefee. "[James] was the type person she never just let on - - you had to ease in the
conversation to ask her something," King explained. Finally, on January 4, James came to King's
house to use the telephone. James had discovered Menefee sitting on James' porch. King said James
was "upset" and "appeared to be scared because [James] said she came out the side window and ran
around to the back of the house to come" to King's.