John Clifford YOUENS, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–87–008–CR.

Court of Appeals of Texas, Beaumont.

Dec. 23, 1987.

Rehearing Denied Jan. 13, 1988.

---

J. Michael Askins, Lufkin, Laura Prigmore, Coldspring, for appellant.

Joe L. Price, Dist. Atty., Groveton, for appellee.

## OPINION

BURGESS, Justice.

Appellant was found guilty of murder and sentenced to life imprisonment by a jury which also made an affirmative finding that appellant used a deadly weapon in committing the murder. Since appellant has challenged the sufficiency of the evidence, a detailed statement of facts follows.

The body of a young woman was found floating in Lake Livingston on March 23, 1986. The body was clad in a nightshirt and wrapped in a quilt. The wrapped body was sewn into a comforter, a pillowcase placed over one end, and tied completely around with panty hose material and one piece of flowered, multicolored cloth. The body thus wrapped in multiple layers had been placed in a blue nylon drawstring bag and attached to two concrete cinder blocks by a decorative chain and a blue-gray work shirt. The body itself had been slash cut thirty-one times and stabbed eight times. The examining pathologist considered three of the stab wounds to be the fatal wounds. The pathologist estimated that the wounds had been inflicted with a sharp, thin-blade knife or knife-like instrument. The pathologist estimated that, as of the date of his examination, the body had been dead a minimum of fourteen days, putting the date of death at March 10, 1986 or earlier. Decomposition had rendered bloodtyping of the deceased no longer possible. The body was identified in early April from dental records as that of Patrice LeBlanc.

The peach-colored comforter in which the body was wrapped was one owned by the deceased and seen in the apartment she shared with appellant. The blue drawstring bag was identified as appellant's laundry bag. The quilt, also kept in the apartment, belonged to appellant. Appellant's former roommate testified that the flowered material used to wrap the body came from appellant's belted, florescent-green flowered bathrobe. Appellant wore both regular pantyhose and "Danskin" pantyhose, whereas the deceased wore neither. One of appellant's neighbors spotted several cinder blocks near the garbage dumpsters, some of which were an unusual color of yellow, and stated that they were no longer there around the first of April.

Appellant's parents owned a lakehouse on Lake Livingston at Cape Royale as well as a boat which was docked at Cape Royale marina. Appellant had access to both. A piece of gold-colored decorative chain was obtained by police from a nail where it was hanging on the garage wall of the lakehouse. The chain was similar in color and design to that attaching the body to one of the concrete cinder blocks. An inspection of the boat revealed numerous fragments of concrete and chips of yellow paint similar in appearance to the yellow paint on the concrete blocks retrieved with the body. Scratch marks in the fiberglass on the bow and right aluminum railing contained what appeared to be yellow or gray paint.

The deceased had been living with appellant in Houston since the Fall of 1985 in an apartment on Timmons Lane. Among the items seized from that apartment and analyzed by a chemist with the Houston Police Department were three items found to be stained by human blood: one of appellant's cowboy boots bearing a stain of type A human blood, a wood scraping from the bedroom closet door stained with human blood of an undetermined type, and a piece of flooring under the carpet of the extra room (referred to also as "the blue room") containing human blood of an unde-

termined type which had been covered by blue paint.

Appellant had type B blood, whereas Leonard McDaniels, a friend of the deceased and former roommate and lover of appellant, had type A blood. Each of the deceased's parents had type A blood. A Houston Police Department chemist testified that considering the parents' blood type, there was a minimum 75% chance that the deceased also had type A blood.

While searching the apartment, officers noticed that the carpet in the blue room was of a different shade than that in the rest of the apartment. The carpet was removed and traced by its manufacturer's number to a Houston carpet store. The owner of the store testified that the new carpet was purchased by appellant and installed March 10, 1986. The old carpet and underlying foam pad had been removed before the deliveryman arrived. Appellant had told the carpet store owner that he was replacing the carpet because it had been ruined by a dog. Appellant told two of his friends, however, he was replacing the carpet because he had spilled blue paint on it while retouching the walls.

The record also shows that on March 6, 1986, appellant pawned several items of jewelry similar to those owned by the deceased, including a 14-carat diamond necklace consisting of nine diamonds mounted in a v-shaped setting, a diamond and emerald ring which had been purchased at the same pawn shop in February 1986 by appellant for a young lady accompanying him, and two diamond stud earrings. The deceased had worn a necklace, earrings, and ring similar in appearance, identifying them to family members and friends as gifts from appellant.

On March 30, 1986, the deceased's father told appellant that he had put out an all points bulletin on the deceased's car. On April 1, 1986, the car was found abandoned at Hobby Airport without its license plates. Appellant was initially interviewed concerning the disappearance of Patrice LeBlanc by Louisiana and Houston authorities before the body was identified. After the body was identified, San Jacinto County authorities attempted to locate appellant for an interview but were unsuccessful. Appellant was ultimately apprehended at his parent's residence in May of 1986 hiding in a closet above the bathroom shower.

Appellant and the deceased appear to have had a romantic relationship prior to her disappearance. Appellant made his living as a female impersonator and was described by a former lover as bisexual. There was some evidence that after appellant met the deceased, he attempted to reverse his sexual identity by ceasing to perform as a female impersonator and by cutting his hair like a man instead of a woman. A friend of Patrice LeBlanc's, testified that appellant loved LeBlanc more than she loved him. Another of the deceased's friends testified that she was very unhappy "towards the end" and wanted out of the relationship but that there was something holding her back which he never discovered; that appellant was extremely jealous of her and did not want her to have many friends. This friend also testified that the deceased stated appellant wanted to marry her but that she did not want to marry him. The deceased was last seen on March 4, 1986. The friend who accompanied her and appellant to a nightclub testified that appellant was acting in an unusually possessive and jealous manner toward the deceased that evening. On March 8, 1986, appellant resumed his work as a female impersonator.

The record also shows that appellant and Leonard McDaniels had been romantically involved and had lived together for five years, part of that time in the Timmons Lane apartment. After McDaniels moved from Timmons Lane, McDaniels and the deceased lived together as roommates with another person. The deceased then moved into the Timmons Lane apartment with appellant. The deceased and McDaniels remained friends throughout this time. McDaniels testified he had a key to the Timmons Lane apartment at one time but that after the deceased moved in, McDaniels delivered the key to her and he never had a key after that. He also testified that he knew where the key to the lakehouse

was, but that he had never been there without appellant and had never driven the boat. McDaniels testified that while he was living in the apartment with appellant, he attempted suicide by cutting his wrists with a razor blade, bleeding "quite a bit" in the bed which was in the blue room at the time. He required no medical attention and no blood soaked through the mattress. McDaniels left town in November of 1985 and did not return until January of 1986.

█ In point of error number two, appellant challenges the sufficiency of the circumstantial evidence generally and asserts the prosecution failed to exclude other hypotheses raised by the defense. Whether by direct or circumstantial evidence, the state must prove each element of its case beyond a reasonable doubt. *U.S. CONST. amend. V & amend. XIV; TEX. CONST. art. I, sec. 19.*

█ The standard for review of both direct and circumstantial evidence cases is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. State,* 672 S.W.2d 801, 803 (Tex.Crim. App.1984). If a circumstantial evidence case is to measure up to this standard, an appellate court must determine that the circumstances exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State,* 673 S.W. 2d 190, 195 (Tex.Crim.App.1984).

Every circumstantial evidence case must be tested for sufficiency of the evidence on its own facts. *Id.* A reviewing court will look at all the evidence in the light most favorable to the verdict. *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App.1984).

The state's case, viewed in the light most favorable to the guilty verdict, consisted primarily of ten circumstances: (1) objects found with the body were taken from appellant's apartment or his parents' lakehouse to which he had access; (2) appellant was familiar with the lake where the body was found and had access to the lake by use of his parents' boat; (3) three objects found in appellant's apartment were stained with human blood, one of which was type A blood; (4) appellant had type B blood, whereas there existed a minimum 75% chance that the deceased had type A blood; (5) appellant replaced the carpet in the blue room shortly after Patrice Le-Blanc disappeared; (6) relations between appellant and the deceased had deteriorated somewhat before her death; (7) appellant pawned the deceased's jewelry shortly after her disappearance; (8) appellant resumed working as a female impersonator after the deceased disappeared; (9) the deceased's car was recovered from the airport without its license plates the day after appellant was told an all points bulletin had been put out on the car; (10) appellant's whereabouts were unknown for over a month from the time the body was identified until he was forceably apprehended by authorities.

Appellant's primary contention under this point of error is that the state's evidence failed to exclude several hypotheses raised by the defense's cross-examination of state witnesses. Appellant, in his brief, points to a number of other men with whom the deceased had come in contact as the potential murderer. The list includes one of their neighbors in Houston who also owned a lakehouse and boat near Lake Livingston; a jogger named "Gary" whom the deceased met in the park; an acquaintance who frequently brought drugs to the apartment where the deceased and McDaniels were living; an unidentified man who, at most, could be described as a "one-night stand" of the deceased and her male friend; and "the myriad of persons [the deceased] met in her butterfly/moth-to-the-candle approach to life." The only evidence adduced at trial concerning any of these people is that set out in this paragraph.

Appellant also asserts, in substance, that the state's evidence is equally consistent with the guilt of Leonard McDaniels, appellant's former lover and a friend of the deceased. He argues that McDaniels had access to the Timmons Lane apartment and the lakehouse and could have known how to run the boat from watching appellant. McDaniels was characterized in appellant's brief as being embroiled in a love triangle with appellant and the victim, an inference

drawn from various facts of record. On the other hand, McDaniels characterized his relationship with the deceased as one of friendship, and stated that his relationship with appellant had been terminated in March 1985. The insinuation that McDaniels fled to Washington is completely unsupported by the facts, which show the "flight" occurred four months before Patrice LeBlanc disappeared.

■ Circumstantial evidence need not exclude every hypothesis that the act may have been committed by another person, but only the hypothesis which is a reasonable one, consistent with the circumstances and facts proven, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Russell v. State,* 665 S.W.2d 771, 776 (Tex.Crim.App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). The above hypotheses are not reasonable ones. Further, such hypotheses are out of harmony with the bulk of the evidence pointing to appellant as the murderer. Aside from appellant's connection with items discovered with the body, the state produced evidence that appellant was in possession of the victim's belongings after her disappearance and pawned them, *cf. Flores v. State,* 551 S.W.2d 364, 368–69 (Tex.Crim.App.1977); that appellant purchased and had installed a new carpet after the deceased disappeared; that the victim's car was discovered abandoned at the airport after appellant had been notified that an APB had been put out on the car; and that after the victim's disappearance, appellant resumed his homosexual lifestyle. After fully considering appellant's point, we find that the evidence produced by the state excluded to a moral certainty the hypothesis that Leonard McDaniels or anyone else committed the murder of Patrice LeBlanc. *Burns v. State,* 676 S.W.2d 118, 120 (Tex.Crim.App.1984). Appellant's second point of error is overruled.

Appellant also claims, in his first point of error, that the prosecutor improperly testified as a legal expert on a question of law to the trier of fact in contravention of the Code of Professional Responsibility. The state called twenty-six witnesses at the trial on guilt and innocence, one of whom was Don Keith, the assistant district attorney trying the case. His testimony was offered by the state solely for the purpose of "going over the law of venue." Keith was presented as an expert on the law and testified about the venue provisions contained in the Texas Code of Criminal Procedure and appellate cases construing those provisions. The state maintains that it offered Keith's testimony to rebut defense efforts to show that the victim was not killed in San Jacinto County.

■ Appellant objects to Keith's testimony on three grounds, the first being that the defense was not provided with Keith's name as a witness prior to trial, pursuant to agreement and direction of the court, resulting in surprise to the defense. The state does not contest that Keith's name was not furnished to appellant pursuant to the court's order. If a witness' name is not furnished a defendant before trial despite court order, any error in allowing that witness to testify over defendant's claim of surprise is made harmless by his failure to object or move for continuance. *Hubbard v. State,* 496 S.W.2d 924, 926 (Tex.Crim. App.1973); *Pinkerton v. State,* 660 S.W.2d 58, 64 (Tex.Crim.App.1983). Appellant here timely objected on grounds of surprise, which objection was denied. However, he could also have requested a continuance to interview the witness or investigate matters about which he was to testify. Failing to do so, he cannot now be heard to complain. *Hubbard,* 496 S.W.2d at 926.

■ Appellant also reiterates the argument asserted in his motion for new trial that Keith's testimony should have been excluded since the act of his testifying violated the Code of Professional Responsibility. We have found no authority and appellant cites none for the proposition that a violation of the Code of Professional Responsibility, committed during the course of the trial, constitutes reversible error absent statutory or other law prohibiting such conduct. The Code of Professional Responsibility affords a criminal defendant no affirmative right. If the assistant dis-

trict attorney indeed committed an ethical violation, a question which we need not reach, the proper recourse would be filing disciplinary proceedings against him.

Appellant also asserts that Keith's testimony should have been excluded since he was not testifying on any facts relative to the case which were to be decided by the jury, but was testifying on a question of law, which should have been addressed to the court. In essence, appellant argues that the state put on "evidence" concerning a question of *law* for the benefit of the jury, which was the trier of *fact* and, in so doing, infringed upon a duty which belongs exclusively to the court.

 The court of criminal appeals has addressed a similar issue, that of making statements of law to the jury during jury argument. The court has held that error in argument does not lie in going beyond the court's charge, but lies in stating law contrary to it. *Mauldin v. State*, 628 S.W.2d 793, 795 (Tex.Crim.App.1982). In addition, a misstatement of the law during the course of jury argument may constitute reversible error. *Burke v. State*, 652 S.W.2d 788, 791 (Tex.Crim.App.1983). In the case at bar, however, the assistant district attorney neither contradicted the court's charge nor misstated the law of venue. Had these statements been made in the form of a jury argument, no error would have occurred. Such statements should not constitute reversible error merely because counsel for the prosecution made them from the witness stand. *See Marteliano v. State*, 155 Tex.Crim. 570, 237 S.W.2d 857, 859 (1951). The court should have excluded the testimony as irrelevant and state's counsel should have properly requested an instruction from the trial judge on the law of venue, *TEX. CODE CRIM.PROC.ANN. art. 36.13* (Vernon 1981) & *art. 36.15* (Vernon Supp.1987), but since the testimony did not misstate the law or conflict with the court's charge, any error in admitting the testimony was harmless. Appellant's first point of error is overruled.

In his third point of error, appellant complains that state's exhibit 39, a photograph of the head and face of the deceased, was inadmissible as lacking probative value or as having a prejudicial effect greatly outweighing its probative value. Dr. Vladimir M. Parungao performed an autopsy of the deceased and testified at trial concerning the process of identifying the body. Part of the identifying procedure included making comparisons between the body and the dental records of Patrice LeBlanc:

Q All right. And could you tell the jury, if you would, Doctor, what do you base your opinion on? What evidence there did you base your opinion on?

A Oh, by comparing some findings on the remains and the finding of the evidence that was given to us, we conclude that this was the person that we examined, that is in the picture that was provided to us. The eyebrow was identical, the fold on both sides of the mouth is similar. The teeth of the remains and the dental records show comparisons, like there was a chipped tooth of the eighth tooth, there is a chip which we clearly see on the remains and the picture they give us, that there was a filling on the third tooth, and there were four teeth that was not present on the remains anymore, the first, the sixteenth, seventeenth and the thirty-second. In short, the wisdom tooth was not there, and then there was an imprint of the tooth that was sent to us that they matched the tooth of the decedent.

Q You mentioned something about a chipped tooth. Is there a photograph in your records there, or in her dental records of her teeth, or is there a record of that chip in there?

A Yes, sir. There was a slide that showed a chipped tooth, and then we have a picture of the remains showing the identical chipped tooth, some configurations. It is odd to have the same thing on the comparison, as very remote not to be this decedent.

After the state offered the photograph of the deceased showing the chipped tooth, counsel for the defense took Dr. Parungao on voir dire and established that he and his colleague were able to make an identifica-

tion of the body without use of the photograph:

Q Yes, sir. Were you able, without this proposed state's exhibit number 39, to make a decision and reach an opinion that Patrice LaBlanc's body and the records, dental records corresponded so you would say the dental records were Patrice LaBlanc's and that the body was that of Patrice LaBlanc, without using this photograph?

A Which photograph you mean?

Q That you have just identified.

A Oh, that was only to show you what we saw.

Q Yes, sir. Well, were you able to establish, through positive identification of the body of that of Patrice LaBlanc, without this photograph?

A Yes, sir, because we have—

The defense objected to admission of the photograph on the basis that it was "not necessary" to prove identity and that the inflammatory nature of the photograph outweighed any legitimate value it possessed.

The admissibility of a photograph is discretionary with the trial court. *Burdine v. State*, 719 S.W.2d 309, 316 (Tex.Crim.App.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). A photograph is admissible in evidence if a verbal description of what is depicted in the photograph is also admissible. *Brown v. State*, 696 S.W.2d 913, 914 (Tex.Crim.App. 1985); *Hougham v. State*, 659 S.W.2d 410, 413 (Tex.Crim.App.1983). It seems clear from the record that Dr. Parungao's description of his observations and comparisons in determining the identity of the body were admissible as part of the basis of his opinion. *Cf. Holloway v. State*, 613 S.W.2d 497, 503 (Tex.Crim.App.1981). It likewise follows from the above cited authorities that since Dr. Parungao could have described what he saw to the jury, a photograph showing what he saw was also properly admitted. *See also Clark v. State*, 627 S.W.2d 693, 705 (Tex.Crim.App.1982) (on motion for rehearing). In addition, there is no error in admitting a photograph where, as here, there is testimony admitted without objection showing the same thing. *Brown*, 696 S.W.2d at 914.

The admission of a photograph into evidence will constitute an abuse of discretion, however, if its probative value is greatly outweighed by its inflammatory potential. *Burdine*, 719 S.W.2d at 316. The prejudicial effect of a photograph may be determined by the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed, and by factors unique to each situation photographed. *Id.*

In the case at bar, the state introduced eighty-five photographs during the course of the trial. Twenty of those photographs showed portions of the exposed body of the deceased. All of these twenty but state's exhibit 39 were admitted without objection. The picture appellant complains of was one taken during the autopsy and was a close-up of the deceased's head and face focusing particularly on the teeth. A total of twelve of the pictures were taken during the autopsy, seven of which showed the head and face of the deceased (some close up) in a state of mutilation and decomposition. The autopsy pictures were three and a half inches by five inches and depicted various wounds all over the body. In addition to the autopsy pictures, the state introduced eight color pictures taken at the dock when the body was first recovered from the lake showing various parts of the exposed body, including some close-up pictures of the many, ghastly wounds. Seven of the dock photographs were eight inches by twelve inches.

Considering the bulk of the photographs admitted, many larger in size and equally, if not more, gruesome than the photo objected to, appellant was not unfairly prejudiced in the admission of state's exhibit 39. Point of error number three is overruled. The judgment of the trial court is affirmed.

AFFIRMED.