**Opinion issued January 31, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00772-CR

———————————

**CLAY RUSSELL JACKSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1267448**

---

## MEMORANDUM OPINION

A jury convicted appellant, Clay Russell Jackson, of the first-degree felony

offense of murder and assessed punishment at twenty-six years' confinement and a

$5,000 fine.[1]  In two issues, appellant contends that (1) the State failed to present sufficient evidence that he acted with the requisite culpable mental state and (2) the trial court erred in admitting into evidence a "duplicative" and "prejudicial" autopsy photograph.

We affirm.

## Background

Brian Robinson worked at Houston Car Audio in northwest Harris County installing car-stereo systems with appellant.  Robinson had met a woman named Anne, the complainant and appellant's girlfriend, on "a couple" of occasions.  One weekend in October 2007, Anne had spent the day at Houston Car Audio while Robinson and appellant worked.  The following Monday, Robinson arrived at work to find appellant already there.  Robinson told appellant about his weekend, and he asked appellant if he had done anything that weekend.  Appellant told him that he "didn't want to know."  In reaction to appellant's unusual response, Robinson asked him several more times what had happened.  Finally, appellant looked up at Robinson and said, "I killed her."  Robinson knew that appellant was referring to Anne, "[b]ecause that was the only person [appellant] was pretty much around at the time," but, at first, he thought that appellant and Anne had been in a car accident, and he asked appellant if that was the case.  Appellant instead

---

[1]     *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (Vernon 2011).

demonstrated a choking motion with his hands, and Robinson understood appellant to mean that he had choked Anne.

Appellant then "basically broke down and started crying." Robinson asked appellant what he was going to do, and appellant responded, "I guess get rid of the body." Robinson told appellant that, morally, he would not be able to live with himself, and appellant "continued to break down." That afternoon, after Robinson had closed the shop for the day, he received a call from appellant, who asked Robinson for a ride. Robinson declined to give appellant a ride, but he did go back to the shop to meet appellant, whose car keys were locked in the shop. Robinson then asked appellant what his attorney had told him, and appellant responded that his attorney "basically told him to go home and take the bags off the body and report a dead body."[2]

Robinson received another phone call from appellant later that afternoon. According to Robinson, appellant was outside his house waiting for the police to arrive. Appellant told Robinson that he had contacted a mutual friend, Harris County Sheriff's Office ("HCSO") Sergeant D. Polk, explained the situation, and received another number to call to report Anne's death. Several days later, Robinson contacted Sergeant Polk, who drove him to the sheriff's office to give a statement.

---

[2] This unnamed attorney does not appear to be the same person as appellant's court-appointed trial counsel.

3

Sergeant Polk testified that, on October 22, 2007, he received a phone call from appellant around 4:00 in the afternoon. Sergeant Polk had poor cellphone reception at the time, and it was difficult for him to hear what appellant was saying, but he testified that appellant said something about "a dead body" and something "in reference to his girlfriend." He stated that he unsuccessfully tried to obtain further information from appellant about what had happened and that he advised appellant to call 9-1-1. Sergeant Polk monitored his patrol radio for a little while after appellant called him, but he did not hear anything related to appellant over the radio. He subsequently gave a statement to HCSO Sergeant L. Davis, the homicide investigator assigned to this case, concerning his knowledge of the situation. Sergeant Polk also testified that, after he gave his statement, Robinson contacted him and explained what he knew, and Polk took Robinson to the sheriff's office to give a statement.

HCSO Deputy R. Mitchell testified that he was dispatched to appellant's trailer around 4:00 p.m. on October 22, 2007. Appellant was standing outside his trailer when Deputy Mitchell arrived, and Mitchell testified that appellant appeared "shaken, but very blank," but he did not appear to be upset. Deputy Mitchell asked appellant what was going on, and appellant responded, "She's in there," and gestured to the trailer. Appellant then unlocked the door for Deputy Mitchell, who went inside and saw a woman lying on her back on the living room floor. Deputy

4

Mitchell checked for vital signs, but the woman was cold to the touch and had no pulse. Appellant was not forthcoming regarding what had happened, so Deputy Mitchell handcuffed him and placed him in the back of his patrol car.

HCSO Investigator M. Quintanilla testified that he arrived at appellant's trailer around 6:45 p.m. and began canvassing the neighborhood and interviewing witnesses. At one point, he was asked to interview a witness at the Litehouse Icehouse, a nearby bar. There, he spoke with Rebecca Carner, a bartender at the Litehouse, who provided information about appellant and directed the officers to a trash bag that appellant had left in the Litehouse dumpster earlier that afternoon. The trash bag contained a plastic tarp, a pair of latex gloves turned inside out, and a wadded-up paper towel. Investigator Quintanilla turned the trash bag over to the crime scene unit officers.

Rebecca Carner testified that she met appellant playing in pool tournaments at another local bar approximately six months before Anne's death. Occasionally, she would see appellant with a woman whom she believed to be appellant's girlfriend, and whom she knew only as Annie, and they would sometimes have drinks at the Litehouse. Carner arrived at the Litehouse around 3:30 p.m. on October 22, 2007. Appellant was already sitting in his truck in the parking lot when she arrived. Carner said hello, and appellant told her "that Annie was dead and he was going to turn himself in and he needed to pay his bar tab." She testified

that appellant "seemed really nervous" and was shaking. As Carner unlocked the bar, appellant pulled a trash bag out of the bed of his truck and placed it in a dumpster on the Litehouse property. Appellant paid his bar tab, and he repeated to Carner that Annie was dead and that he was going to turn himself in. Carner did not ask for any further information about what had happened.

Appellant stayed at the Litehouse for about five to ten minutes. After he left, Carner went to the dumpster and found the bag that appellant had tossed in there. She opened the bag and saw a plastic tarp inside. Carner later spoke with police officers about her encounter with appellant, and she pointed out the trash bag to the officers.

Sergeant Davis testified that when he entered the living room of appellant's trailer, he saw a woman lying on the floor. In the course of the investigation, he checked appellant's trash can and discovered that there was no trash inside, which struck him as unusual, so he located a dumpster outside the trailer. Sergeant Davis saw a trash bag in the dumpster that matched the trash bags appellant kept in his kitchen, and he searched the trash bag. Inside, he found a box for latex gloves and a purse. Sergeant Davis looked in the purse and found a social security card and a driver's license in the name of Anne Betts Green.[3] The picture on the driver's

---

[3] Dr. Morna Gonsoulin, one of the assistant medical examiners who participated in Anne's autopsy, testified that, after the autopsy, she ran a fingerprint comparison

6

license matched the complainant. Later that evening, Deputy Quintanilla brought the trash bag that he had recovered from the Litehouse to appellant's trailer, and Sergeant Davis looked through that bag as well. In that bag, he found a blue plastic tarp and a pair of latex gloves that matched the brand of the glove box that he had found in the trash bag with Anne's purse.

Sergeant Davis testified that Anne had bruising and discoloration around her neck and left shoulder. He stated that Anne's body had a "slight onset of decomp[osition]" that "wasn't advanced," and he came to the conclusion that Anne might have died that day. On October 23, 2007, the day after police discovered Anne's body, Sergeant Davis attended her autopsy. The prosecutor showed Sergeant Davis State's Exhibit 52, a picture taken at the medical examiner's office depicting a unique medical/legal reference number and a photograph of Anne from the shoulders up, which displayed her injuries. Sergeant Davis testified that he recognized Anne and the reference number and that Exhibit 52 depicted "the same female that [he] had seen [at appellant's trailer] the night before." The State then offered Exhibit 52 into evidence.

Defense counsel stated that he "may not have an objection if [Exhibit 52 was] offered through the medical examiner," and the prosecutor responded that she could offer it through the medical examiner, but Sergeant Davis had identified the

and determined that Anne's name was Anne Green Betts. Because of this discrepancy, we refer to the complainant as "Anne" for the sake of clarity.

7

person depicted in Exhibit 52 "as being the same person he saw [at the murder scene]." Defense counsel then stated that Sergeant Davis's testimony was unnecessary and that the photograph was not needed to establish identity. The prosecutor replied that it had not been established that "the same person at the house was the one that they autopsied." Defense counsel then clarified his objection: "Under Rule 403, that the prejudicial nature of the photograph substantially outweighs any probative value it has. That all it will do is—it's duplicitous [sic] or will be duplicitous of any further testimony and I object to it for that reason." The trial court overruled the objection and admitted Exhibit 52. The trial court also admitted eight photographs of the crime scene and four photographs from Anne's autopsy. Defense counsel did not object to the admission of any of these pictures.

Sergeant Davis testified that he was not able to determine what weapon had been used to murder Anne, but it could have been hands or some other object placed around her neck. He formed the opinion that Anne had died as a result of strangulation.

Former HCSO Investigator S. Grounds, with the crime scene unit, testified that she collected a box of Playtex gloves from a dumpster near appellant's trailer and a pair of Playtex gloves from a dumpster at the Litehouse. Investigator Grounds also obtained a DNA sample from appellant via a buccal swab. Mark

8

Powell, with the Harris County Institute of Forensic Sciences, conducted DNA testing on the gloves found in the Litehouse dumpster. He testified that appellant could not be excluded as a contributor to the DNA found on the gloves. Powell also testified that he tested the tarp found in the Litehouse dumpster, which had a blood stain on it, and he obtained a DNA profile consistent with Anne's DNA profile.

Dr. Morna Gonsoulin, a medical examiner at the Harris County Institute of Forensic Sciences, testified that she participated in performing Anne's autopsy. Dr. Gonsoulin testified that Anne's body "appeared to have undergone some changes of decomposition" before the time of the autopsy. She estimated that Anne had probably been dead for around twenty-four hours. Dr. Gonsoulin also testified that Anne had injuries and bruising on the left side of her neck, including internal hemorrhaging in her neck muscles, and that Anne also had petechial hemorrhages in her right eye, which, she testified, is usually indicative of an "asphyxia cause of death." Anne had minor bruising on her scalp, and she did not have any injuries to her hands.[4] Dr. Gonsoulin testified that her office ruled the cause of Anne's death as asphyxia due to strangulation.

The jury found appellant guilty of murder and assessed punishment at twenty-six years' confinement and a $5,000 fine.

---

[4] HCSO Investigator G. Clayton, with the crime scene unit, testified that he photographed appellant at the scene and that appellant had no visible injuries.

9

**Sufficiency of the Evidence**

In his first issue, appellant contends that the State failed to present sufficient evidence of the requisite culpable mental state for murder.[5]

*A.      Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence).  The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony.  *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008).  A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.  *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson*

---

[5]      Appellant challenges both the legal and factual sufficiency of the evidence.  In *Brooks v. State*, the Court of Criminal Appeals overruled *Clewis v. State* and its progeny and held that evidence is to be reviewed solely under the sufficiency standard described in *Jackson v. Virginia*.  323 S.W.3d 893, 912 (Tex. Crim. App. 2010) ("[W]e decide that the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element . . . beyond a reasonable doubt."); *Ervin v. State*, 331 S.W.3d 49, 52–54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (construing majority holding in *Brooks*).

10

*v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's determinations of credibility. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

### B. Requisite Culpable Mental State for Murder

To establish that appellant committed murder, the State was required to prove that appellant either intentionally or knowingly caused Anne's death by strangling her with his hands or an unknown object or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Anne's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (Vernon 2011). A defendant acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to

11

engage in the conduct or cause the result. *Id.* § 6.03(a) (Vernon 2011). A defendant acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b). A defendant acts knowingly or with knowledge with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* Intent may be inferred from circumstantial evidence such as the appellant's acts, words, and conduct. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Dominguez v. State*, 125 S.W.3d 755, 761 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Intent may also be inferred from the use of a deadly weapon, unless it would not be reasonable to infer that death or serious bodily injury could result from use of the weapon. *See Dominguez*, 125 S.W.3d at 761 (citing *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) and *Ahrens v. State*, 43 S.W.3d 630, 634 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd)). The jury may also infer intent from the extent of the complainant's injuries. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

We first observe that, although appellant argues that the State had to establish that he intended to kill Anne, neither the indictment nor the jury charge so required. Instead, under the indictment and the charge, the State had to establish that appellant intentionally or knowingly caused Anne's death *or* that he intended

to cause serious bodily injury and committed an act clearly dangerous to human life that caused Anne's death. Because the charge authorized the jury to convict on alternative theories, we will uphold the verdict if the evidence was sufficient on any one of the theories. *See Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

The State presented evidence that appellant confessed to Robinson that he had killed Anne, and when Robinson questioned how she died, appellant held his hands in a choking position. Anne had significant bruising to the left side of her neck, petechial hemorrhages in her eyes, and internal hemorrhages in her neck muscles, and the medical examiner concluded that her cause of death was asphyxiation by strangulation. When Robinson asked appellant what he was going to do, appellant responded, "I guess get rid of the body." The State presented evidence that, before appellant ultimately decided to call 9-1-1, he attempted to cover up Anne's death by throwing away her purse with her identification information and disposing of a tarp, which had blood consistent with Anne's DNA profile on it, and latex gloves at a different location from her purse.

Although appellant did not explicitly tell Carner that he "killed Anne," as he told Robinson, he told her that Anne was dead, that he needed to pay his bar tab, and that he was going to turn himself in, suggesting that he was responsible for Anne's death. The State also presented evidence that appellant did not have any

visible wounds or injuries on him, nor did Anne have any injuries on her hands, indicating that they were not involved in a physical fight when Anne died.

When viewing this evidence in the light most favorable to the verdict, we conclude that a rational jury could have determined that appellant caused Anne's death either intentionally or knowingly, or, at the least, that he intended to cause serious bodily injury and committed an act clearly dangerous to human life—namely, choking her—that resulted in Anne's death. *See Adames*, 353 S.W.3d at 859; *Guevara*, 152 S.W.3d at 50 (inferring mental state from defendant's acts, words, and conduct). We therefore hold that the State presented sufficient evidence that appellant possessed the requisite culpable mental state to support a conviction for murder.

We overrule appellant's first issue.

### Admission of Evidence

In his second issue, appellant contends that the trial court erred in admitting into evidence an autopsy photograph because it was unnecessary after Sergeant Davis testified that the autopsy was performed on the same woman he had observed at the crime scene.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002) (citing *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001)); *see also Gallo v.*

14

*State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007) ("The admissibility of a photograph is within the sound discretion of the trial judge."). We will not reverse the trial court's ruling unless the ruling falls outside the zone of reasonable disagreement. *Torres*, 71 S.W.3d at 760. In applying the abuse of discretion standard, we may not reverse a trial court's admissibility decision solely because we disagree with it. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). We will not disturb a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

The first step in determining whether evidence should be admitted is whether the evidence is relevant. *See Montgomery v. State*, 810 S.W.2d 372, 375 (Tex. Crim. App. 1990). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Generally, a photograph is admissible if verbal testimony as to matters depicted in the photograph is also admissible. *Gallo*, 239 S.W.3d at 762 (citing *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997)). In *Gallo*, a capital murder case, the Court of Criminal Appeals held that "[a] visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination." *Id.* The fact that the jury also hears testimony regarding the

15

depiction in the photograph "does not reduce the relevance of the visual depiction." *Id.*

Rule of Evidence 403 provides that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Rule 403 "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo*, 239 S.W.3d at 762. A proper Rule 403 analysis includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005). Rule 403 requires that the photograph have some probative value and that its probative value not be substantially outweighed by its inflammatory nature. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

"Autopsy photographs are relevant to show the identity of the victim and the manner and means of death. These photographs are admissible under rule 403 even if they merely corroborate other kinds of evidence." *Moreno v. State*, 1 S.W.3d 846, 857 (Tex. App.—Corpus Christi 1999, pet. ref'd); *see also Williams*,

16

301 S.W.3d at 690 (holding that autopsy photographs are generally admissible unless they depict mutilation of victim caused by autopsy itself); *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) ("A trial court does not err merely because it admits into evidence photographs which are gruesome.").

Here, the prosecutor showed Sergeant Davis Exhibit 52, a picture of Anne taken by the medical examiner's office and displaying both her injuries and the particular medical/legal reference number, and she asked him if he recognized the individual depicted in the photograph and whether the reference number matched the autopsy that he attended. When the State offered this exhibit, defense counsel initially objected that the photograph was not being offered through the medical examiner. The prosecutor responded that photograph was necessary for Sergeant Davis to identify Anne, and defense counsel then argued that Davis's testimony was unnecessary and could "cause confusion of the issues." Defense counsel clarified his objection: "Under Rule 403, that the prejudicial nature of the photograph substantially outweighs any probative value it has. That all it will do is—it's duplicitous [sic] or will be duplicitous of any further testimony and I object to it for that reason." The trial court overruled the objection and admitted the photograph.

Appellant argues that the photograph was irrelevant and lacked probative value because Sergeant Davis identified Anne without the photograph and testified

17

to that effect. Appellant does not argue that the eight crime-scene and four additional autopsy photographs also admitted by the trial court into evidence rendered Exhibit 52 duplicative and unnecessary. As the Court of Criminal Appeals noted in *Gallo*, "A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination. The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction." 239 S.W.3d at 762. The State offered Exhibit 52 for the purpose of establishing that the woman Sergeant Davis had identified as Anne at appellant's trailer was the same woman whose autopsy he attended, and Davis identified the medical/legal reference number visible in Exhibit 52 as the particular number applicable to this case. *See Dams v. State*, 872 S.W.2d 325, 327 (Tex. App.—Beaumont 1994, no pet.) ("The victim's mother identified the subject of the exhibit in question [an autopsy photograph] as Linda Gayle Maddux, and the assistant medical examiner identified it as a photograph of the person upon whom he performed the autopsy through which the State proved cause of death. The exhibit was relevant.").

There was no error in the trial court's admission of the photograph in addition to the admission of Sergeant Davis's testimony. *See Gallo*, 239 S.W.3d at 762; *see also Youens v. State*, 742 S.W.2d 855, 862 (Tex. App.—Beaumont 1987, pet. ref'd) ("[S]ince Dr. Parungao could have described what he saw to the jury, a

18

photograph showing what he saw was also properly admitted. In addition, there is no error in admitting a photograph where, as here, there is testimony admitted without objection showing the same thing."). The fact that the State offered the photograph in addition to Sergeant Davis's testimony stating that the autopsy depicted in Exhibit 52 was performed on the same woman he had observed at the crime scene does not destroy the probative value of the photograph. *See Gallo*, 239 S.W.3d at 762; *Dams*, 872 S.W.2d at 327. The photograph was still relevant evidence. S*ee Moreno*, 1 S.W.3d at 857 (holding that autopsy photographs are admissible under Rule 403 "even if they merely corroborate other kinds of evidence"); *Macias v. State*, 959 S.W.2d 332, 338 (Tex. App.—Houston [14th Dist.] 1997 pet. ref'd) ("Plainly State's exhibits 11 through 15 [depicting skeletal remains and clothing found at murder scene] were relevant to the State's case at the guilt-innocence phase because they helped to prove complainant's identity. Likewise, State's exhibits 16 through 19 were relevant to establish the cause of death.").

We conclude that the trial court did not abuse its discretion in admitting State's Exhibit 52.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Massengale, and Brown.

Do not publish.   TEX. R. APP. P. 47.2(b).