

## COURT OF APPEALS
## EIGHTH DISTRICT OF TEXAS
## EL PASO, TEXAS

| | | |
|---|---|---|
| JOHN STEVEN HERNANDEZ, | § | No. 08-24-00094-CR |
| Appellant, | § | Appeal from the |
| v. | § | 450th Judicial District Court |
| THE STATE OF TEXAS, | § | of Travis County, Texas |
| Appellee. | § | (TC# D-1-DC-22-302170) |

## MEMORANDUM OPINION[1]

Appellant John Steven Hernandez appeals his conviction for the murder of Marisela

Gonzalez. Finding no error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following is a brief summary of the testimony and evidence presented at trial:

Hernandez and Gonzalez were in a relationship and had recently begun living together in

Gonzalez's apartment. On September 15, 2022, at 2:25 a.m., 911 received a call from Hernandez's

phone reporting a gunshot victim but providing no other information. At trial, the caller's voice

[1] [1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Third Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

was identified as Hernandez's. As law enforcement searched for the location, they were flagged down by a resident of the apartment complex who led them to Gonzalez's apartment and told the officers that he saw a short black or Hispanic male leaving the apartment wearing a white shirt, red shorts, and a red hat.

Gonzalez was found alone in the bedroom of the apartment with a close-range gunshot to the neck. Although she had a faint pulse when law enforcement first arrived, she died soon afterwards. There were no signs of forced entry to the apartment. Law enforcement found ammunition, a gun magazine, and a holster in the apartment, but did not find a firearm. A detective testified that when searching the apartment, they did not find any bloody footprints or handprints; however, a crime scene investigator agreed that there was a stain on a door frame that appeared to be blood but was not tested. A crime scene specialist testified that she tried to collect prints on the door handles and deadbolts and did not observe any fingerprints at the scene. During trial, however, the prosecutor noticed fingerprints in the photograph of the magazine for ammunition. Those were tested as trial progressed, but did not yield any prints that were suitable for comparison. A washcloth that was found on the floor was tested and had the DNA of Gonzalez, Hernandez, and an unknown individual. Law enforcement did not ask that the national database be searched for a match to that DNA.

Four cell phones were found in the apartment. A detective testified that three did not work but admitted that they may have been operational and just out of battery. The fourth cell phone was Gonzalez's. An Austin Police Department digital forensics specialist analyzed Gonzalez's phone, but not the three others, and testified about argumentative text messages between Gonzalez and Hernandez on the night of the murder. He also testified about a photograph of a gun found on the phone. Gonzalez's son testified that the hands in the photograph, which had distinctive tattoos,

were his mother's although he stated that she did not have any guns. He also testified that Hernandez had shown him a gun on two different occasions.

On the stairway outside of the apartment, law enforcement found a beer, a bottle of water, and a bag from a nearby convenience store. Review of the surveillance tape from that store showed Hernandez buying those items earlier the night before. His clothing–a white shirt and red shorts– matched the description given by the neighbor. Hernandez was not the only person who matched the description. A black male wearing a white shirt and red shorts was seen at the bus stop near the apartment complex and was detained.[2] He voluntarily went to the police station to be interviewed. Although he was swabbed for gunshot residue, those swabs were not tested.

Hernandez's cell phone records were analyzed and, together with the text messages obtained from Gonzalez's phone, provided information about Hernandez's general location and communications with Gonzalez on the night of the murder. The records confirm that Hernandez went to the convenience store earlier in the night and returned to the apartment. He left again around 12:30 a.m. and went to a park. At 1:12 a.m., after Hernandez sent Gonzalez a text that he was on his way back to the apartment, the records show that he began moving back towards the apartment. The text messages extracted from Gonzalez's phone show that the two were arguing about money and Hernandez was locked out of the apartment when he came back. His last text to Gonzalez was at 2:15 a.m. After his call to 911 at 2:25 a.m., Hernandez left the apartment. He was not there when law enforcement arrived.

Both Hernandez's aunt and his ex-girlfriend testified that they saw Hernandez in the days after Gonzalez's death and that he was sad and crying although he did not say why. Hernandez

---

[2] He did not entirely match the description of the suspect because he was tall.

3

went to Mexico and was there until his father convinced him to come back. He was arrested on a warrant when he crossed the border.

At trial, Hernandez's defense theory was that Gonzalez committed suicide. Gonzalez's son testified that Gonzalez had been sad because of recent deaths of a brother and ex-boyfriend. In a recording of Doorena Reyes (Gonzalez's mother) waiting to speak to the police, she can be heard telling someone on the phone that Gonzalez may have committed suicide and that "all the signs were there." The medical examiner ruled that the manner of death was undetermined because, "although the circumstances are suspicious for homicide . . . , suicide cannot be entirely excluded."

The jury returned a guilty verdict and sentenced Hernandez to 36 years. Hernandez appeals his conviction, raising two issues. He argues that the evidence was not legally sufficient to support the judgment and that the trial court erred by allowing a non-disclosed expert witness to testify.

## II. ANALYSIS

To convict Hernandez, the State was required to prove beyond a reasonable doubt that Hernandez intentionally or knowingly caused Gonzalez's death, which the State alleged was by shooting her with a firearm. Tex. Penal Code Ann. § 19.02(b)(1). Hernandez challenges the sufficiency of the evidence to prove each of these elements.

### A. Sufficiency of the evidence

### (1) Standard of review

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (Tex. 1979); *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010). In a review the legal sufficiency of the evidence to support a conviction, we must defer to the factfinder who has the duty to "fairly resolve conflicts in the testimony, to weigh the evidence, and to draw

4

reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 318–19. If *any* rational juror could have found the defendant guilty beyond a reasonable doubt, we must affirm. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In this case, the State relied on circumstantial evidence; there were no eyewitnesses to the crime or other direct evidence. Our review of the evidence does not distinguish between circumstantial and direct evidence. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.*

### (2) Evidence that Hernandez caused Gonzalez's death

Hernandez argues that the evidence does not show that it was him, rather than another person, or Gonzalez herself, who caused Gonzalez's death. In his brief, Hernandez discusses evidence individually and argues that each is not evidence that he killed Gonzalez. For example, he argues that the fact that Hernandez matched the description of the person that fled the scene is not evidence that Hernandez killed Gonzalez. But we do not consider evidence in isolation. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

"Prior behavior by the defendant toward the deceased can [] be relevant to a determination of whether the defendant murdered the victim." *Nisbett v. State*, 552 S.W.3d 244, 265–66 (Tex. Crim. App. 2018). The jury heard evidence that Hernandez and Gonzalez had a volatile relationship. Gonzalez's mom described the relationship as "toxic." Gonzalez's son testified that he saw them argue "countless times" and he described different incidents where Hernandez kicked

5

Gonzalez's leg, hit her in the face, and kicked her door down. Cell phone records show that the Hernandez and Gonzalez were arguing by text the night Gonzalez was killed.

Evidence also placed Hernandez at Gonzalez's apartment at the time of the murder. *Ford v. State*, 444 S.W.3d 171, 181 (Tex. App.—San Antonio 2014), *aff'd*, 477 S.W.3d 321 (Tex. Crim. App. 2015) (relying on circumstantial evidence of appellant's presence at the crime scene to support the conviction). Surveillance video showed Hernandez buying beer and a water from a nearby convenience store. Those same items were found on the stairs outside of the apartment. Of course, Hernandez lived with Gonzalez, so this in and of itself would not have been incriminating. But cell phone records show that Hernandez was gone much of the night but returned and was at the apartment for a short period during the time of Gonzalez's murder. Hernandez left the apartment around 12:30 a.m. and returned around 2:00 a.m. to find that Gonzalez had locked the door. The two continued to argue until the texts between them abruptly stopped at 2:15 a.m. Although Hernandez and Gonzalez frequently communicated by phone–there were 916 messages and 148 calls in the month before Gonzalez was killed–there were no calls or texts after her murder, indicating that Hernandez knew exactly when she died. *Willyam v. State*, No. 05-11-01600-CR, 2013 WL 1286160, at *7 (Tex. App.—Dallas Mar. 6, 2013, no pet.) (not designated for publication) (noting that texts "abruptly stopped . . . within the window of the medical examiner's time of death"). Immediately after Hernandez called 911, phone records show that Hernandez left the crime scene. *Gonzales v. State*, 330 S.W.3d 691, 695 (Tex. App.—San Antonio 2010, no pet.) ("Flight from the scene of a crime may also be circumstantial evidence of guilt."). And Hernandez matched the description of the person who fled the scene. *Threadgill v. State*, 146 S.W.3d 654, 662 (Tex. Crim. App. 2004) (en banc) (detailing the circumstantial evidence against the appellant which included the fact that he matched an eye-witness description). Finally, the jury could have

6

found that the fact that Hernandez left the country was evidence that he was continuing to flee law enforcement. *Gosch v. State*, 829 S.W.2d 775, 782 (Tex. Crim. App. 1991) (en banc) (including evidence that defendant attempted to leave the country as evidence connecting appellant to murder).

Hernandez argues that it is "a more rational inference" that Gonzalez committed suicide. He points to evidence that Gonzalez's mother told someone on the phone that "all the signs were there" that Gonzalez was suicidal and that the medical examiner could not rule out suicide.[3] He also argues that the fact that Hernandez travelled to Mexico was not evidence that he was hiding because he was with family and was able to be found. However, it is not a ground for reversal that a jury could have, but did not, make the inferences urged by the defendant. It is the jury's province "to draw reasonable inferences from basic facts to ultimate facts," *Hooper*, 214 S.W. 3d at 13. And "[w]hen the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination." *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015). Moreover, the State does not have "to disprove every innocent explanation of the evidence before a jury can find a defendant guilty." *Cary v. State*, 507 S.W.3d 761, 765–66 (Tex. Crim. App. 2016). So long as the inferences that the jury made were rational, and we hold that they were, we cannot disturb the verdict. *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009) ("Our role on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally.").

---

[3] Hernandez claims that because the examiner could not determine the manner of death, "it was just as likely to have been a homicide as it was a suicide." But the examiner was clear that she did not believe that suicide "was just as likely" as homicide. She in fact testified about the reasons that she did not think it probable that Gonzalez died by suicide, even though she found that suicide could not "be entirely excluded." Gonzalez was right-handed, but she was shot on her left side. The trajectory of the bullet was not common for a suicide. Most importantly, no gun was found at the scene.

Cumulatively, the evidence supports a rational inference that Hernandez caused Gonzalez's death.

### (3)  Evidence that Hernandez used firearm

It is undisputed that Gonzalez was shot with a gun. Hernandez argues that because there was no evidence that the firearm was one that he "may have possessed in the past," the evidence was legally insufficient. But "the State need not connect appellant to a specific murder weapon or ammunition." *Temple v. State*, 342 S.W.3d 572, 590–91 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013); *see also Sturdivant v. State*, 445 S.W.3d 338, 348–49 (Tex. App.—Houston [1st Dist.] 2013), *petition for discretionary review granted, judgment vacated*, 411 S.W.3d 487 (Tex. Crim. App. 2013) (same); *Bradley v. State*, 359 S.W.3d 912, 917 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) ("Likewise, the jury alone weighs the evidence, and it may find guilt without physical evidence linking the accused to the crime."). Even if such evidence were required, the jury heard evidence that Hernandez possessed a gun or at least had access to one. Gonzalez's son testified that Hernandez showed him a gun on two different occasions. The evidence also included a photograph of Gonzalez's hands holding a gun, from which a jury could infer that a gun, even if it did not belong to Hernandez, was in the apartment and could have been used by Hernandez.

### (4)  Evidence of *Mens Rea*

The State was required to prove that Hernandez caused Gonzalez's death either intentionally (with the "conscious objective or desire to . . . cause the result") or knowingly (with "aware[ness] that his conduct is reasonably certain to cause the result"). Tex. Penal Code Ann. §§ 6.03(a), (b); 19.02(b)(1). Hernandez argues that there was no evidence from which a jury could find that he had the requisite *mens rea*.

Evidence of a defendant's *mens rea*, like other elements of a crime, can be proved by circumstantial evidence. And because of the nature of this element, it usually is. "We cannot read an accused's mind, and absent a confession, we must infer his mental state from his 'acts, words and conduct.'" *Nisbett*, 552 S.W.3d at 267 (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)). No particular kind of evidence is necessary; rather, the jury can infer the defendant's culpable state of mind from "any facts which tend to prove its existence." *Louis v. State*, 329 S.W.3d 260, 268–69 (Tex. App.—Texarkana 2010), *aff'd*, 393 S.W.3d 246 (Tex. Crim. App. 2012).

Gonzalez died from a gunshot to her neck. The medical examiner testified that gunpowder near the entry wound as well as an abrasion that could have been from the muzzle of the gun indicate that the gun was either in contact with, or close range of, Gonzalez when it was fired. "[W]here a deadly weapon is fired at close range and death results the law presumes an intent to kill." *Womble v. State*, 618 S.W.2d 59, 64–65 (Tex. Crim. App. [Panel Op.]1981); *see also Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) ("The jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon.").

Hernandez contends that the fact that he called 911 leads to only one inference–that he did not intentionally or knowingly kill Gonzalez. He states "[i]t defies logic that a defendant who intended to cause the death of another would call emergency services." Again, it was within the province of the jury to weigh the evidence and draw inferences. The jury could have inferred from the 911 call that Hernandez felt remorse *after* shooting Gonzalez even though at the time he pulled the trigger, he intended for her to die or at least knew death was the likely result. In drawing

inferences, the jury could also consider the fact that although Hernandez called 911, he did not provide any information and left before they arrived.

Although circumstantial, the evidence was sufficient for a rational juror to find that Hernandez intentionally or knowingly caused Gonzalez's death with a firearm. We overrule issue one.

### B.  Admissibility of expert witness testimony

Among the photographs of the crime scene that were admitted into evidence was a photograph of the gun magazine that was found on Gonzalez's bed. At a bench conference, the State informed the trial court that when the image was enlarged during trial, fingerprint ridges could be seen on the magazine.[4] Because it had not been tested for prints and a fingerprint could potentially be exculpatory, the State sent the magazine for immediate testing mid-trial.[5]  Later in the trial, Erin Lagrone, a latent fingerprint examiner, was called to testify by the State. Hernandez objected because Lagrone had only been disclosed as a potential law enforcement witness but was not included in the State's disclosures of forensic science experts. The trial court overruled the objection and Lagrone testified that there were no latent prints on the magazine suitable for comparison to the prints of Hernandez or Gonzalez or any other person. Hernandez argues that the trial court abused its discretion by allowing Lagrone to testify as a latent print expert witness.

The State, upon request, must identify its witnesses prior to trial. Tex. Code Crim. Proc. Ann. art. 39.14(b). The failure to timely identify witnesses, however, does not result in their automatic exclusion. The trial court has discretion to allow an undisclosed witness to testify after

---

[4] Detective Ericka Valenzuela testified that the magazine had not been examined for prints because magazines often have many people's prints on them, and they assumed that testing would not be helpful.

[5] The State must disclose "exculpatory, impeachment, or mitigating" information whether they discover it before, during, or even after trial. Tex. Code Crim. Proc. Ann. art. § 39.14(h), (k).

10

considering any "showing of bad faith on the part of the prosecutor" and "whether the defendant can reasonably anticipate that the witness would testify." *Nobles v. State*, 843 S.W.2d 503, 514–15 (Tex. Crim. App. 1992) (en banc) (quoting *Hightower v. State*, 629 S.W.2d 920, 925 (Tex. Crim. App. [Panel Op.] 1981). We consider those same factors in deciding whether the trial court abused its discretion. *Id.* "As long as the judge's ruling is within the zone of reasonable disagreement, we will not intercede." *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002) (en banc).

Hernandez concedes that there is no showing that the State acted in bad faith. We therefore consider only whether he could have anticipated Lagrone's testimony. In making that determination, the courts typically examine three factors:

> (1) the degree of surprise to the defendant; (2) the degree of disadvantage inherent in that surprise (e.g., the defendant was aware of what the witness would say, or the witness testified about cumulative or uncontested issues); [and] (3) the degree to which the trial court was able to remedy that surprise (e.g., by granting the defense a recess, postponement, or continuance, or by ordering the State to provide the witness' criminal history).

*Martinez v. State*, 131 S.W.3d 22, 29 (Tex. App.—San Antonio 2003, no pet.)

Prior to trial, Hernandez was notified that the State might call latent fingerprint examiners as expert witnesses. And when he learned that the State requested mid-trial that the prints be lifted and tested, he was on notice that *someone* may testify about the results. He made no objection at that point to the lack of notice. Although the fact that it was Lagrone who was called to testify was a surprise to Hernandez, the degree of the disadvantage was small because he knew that fingerprint experts may testify. *Hamann v. State*, 428 S.W.3d 221, 228–29 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("the degree of disadvantage inherent in that surprise was minimal because appellant was aware that the State would call a fingerprint expert to testify and that the State

11

intended to introduce evidence of his previous convictions"); *Gowin v. State*, 760 S.W.2d 672, 674 (Tex. App.—Tyler 1988, no pet.) (same). Finally, Hernandez cannot complain that the trial court failed to remedy the surprise. He claims that the lack of notice that Lagrone would testify "deprived [him] of his ability to seek an expert to consult with or to call to testify regarding the merits of Lagrone's testimony." But he did not request a continuance for this purpose when he learned that the prints would be lifted and tested or when Lagrone was called to testify.[6]

Even if it were error to allow Lagrone to testify, the error was harmless. The improper admission of expert witness testimony is non-constitutional error and not grounds for reversal unless it affects the defendant's "substantial rights." Tex. R. App. P. 44.2 (b); *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Id*. Lagrone testified that the prints on the magazine were not suitable for comparison. Her testimony was not evidence of Hernandez's guilt, and it did not disprove any of Hernandez's defensive theories. It did not influence the jury's verdict because the admission of the testimony essentially placed the parties in no different position than they would have been in had the testimony not been offered.

---

[6] Some courts have held that a defendant's failure to request a continuance is dispositive. The Court of Criminal Appeals has stated that "any error in allowing that witness to testify over a claim of surprise is 'made harmless' by defendant's failure to object *or* move for a continuance." *Barnes v. State*, 876 S.W.2d 316, 328 (Tex. Crim. App. 1994) (en banc) (emphasis added) (citing *Youens v. State*, 742 S.W.2d 855, 860 (Tex. App.—Beaumont 1987, pet. ref'd)). Despite using the disjunctive "or," the Court went on to hold that even though the appellant objected, he could not "now be heard to complain" because he failed to request a continuance. *Id. See also Rushing v. State*, 50 S.W.3d 715, 729 (Tex. App.—Waco 2001), *aff'd*, 85 S.W.3d 283 (Tex. Crim. App. 2002) ("even if there is an abuse of discretion, if the defendant fails to move for a continuance to have more time to prepare for cross-examination of the witness, any error is rendered harmless"); *Vierling v. State*, No. 01-10-00247-CR, 2012 WL 4857363, at *5–6 (Tex. App.—Houston [1st Dist.] Oct. 11, 2012, pet. ref'd) (mem. op., not designated for publication) (same). However, many courts consider the failure to request a continuance as only a factor to be considered. *See, e.g. Martinez v. State*, 131 S.W.3d 22, 29 (Tex. App.—San Antonio 2003, no pet.); *Branum v. State*, 535 S.W.3d 217, 226–27 (Tex. App.—Fort Worth 2017, no pet.).

Therefore, even if allowing Lagrone to testify was error, it did not affect Hernandez's substantial rights.

We overrule Hernandez's second issue.

## III. CONCLUSION

After considering all the evidence and the inferences a rational jury could draw from that evidence, we hold that there was sufficient evidence to support Hernandez's conviction. We further hold that the court did not abuse its discretion in allowing the testimony of an undisclosed expert witness. The judgment of the trial court is affirmed.

MARIA SALAS MENDOZA, Chief Justice

March 25, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)